UNITED STATES of America, Appellee,

v.

Joseph COFFEY, Defendant-Appellant.

No. 1187, Docket 87–1106.

United States Court of Appeals,
Second Circuit.

Argued June 16, 1987.

Decided June 30, 1987.

Bruce A. Green, Asst. U.S. Atty., S.D. N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Steven M. Kaplan, Asst. U.S. Atty., of counsel), for appellee.

David Breitbart, New York City, for defendant-appellant.

Before OAKES, MESKILL and PRATT, Circuit Judges.

PER CURIAM:

Joseph Coffey appeals from a judgment of conviction entered against him in the United States District Court for the Southern District of New York following a two-week jury trial before the Hon. Leonard B. Sand, *Judge,* for conspiring to rob funds of federally insured banks in violation of 18 U.S.C. § 371. Coffey's sole claim on appeal is that he was denied a fair trial when the prosecutor referred to extra-record facts during his rebuttal summation. Our careful review of the trial transcript satisfies us that the prosecutor's conceded error, promptly corrected by the trial judge, did not deprive Coffey of any substantial right. Accordingly, we affirm.

In August 1986 Coffey and two others were charged in a three-count indictment for their alleged involvement in the April 29, 1985 armed robbery of $7.9 million cash of federally insured bank funds from the Wells Fargo Armored Services Company ("Wells Fargo"). In addition to the conspiracy count mentioned above, each defendant was also charged with the substantive counts of armed robbery, 18 U.S.C. §§ 2113(d), 2, and carrying a firearm during a crime of violence, *id.* § 924(c). Coffey was acquitted of the substantive counts; his co-defendants were acquitted on all counts.

At trial the government attempted to demonstrate through eyewitness testimony that Coffey and his co-defendants, masked and armed, accosted four guards at the Wells Fargo offices in Manhattan shortly after the main vault had been opened, subdued the guards with handcuffs, and absconded in a Wells Fargo armored car with $7.9 million in cash. One of the guards testified that he had observed one of the robbers, a white male fitting the approximate age and physical description of Coffey, dragging his right leg as he walked. In their haste, however, the robbers left behind the keys to the storage compartment of the armored car, which locks automatically upon closing the back doors.

The government's chief trial witness was an accomplice in the robbery, Jeffrey Grubczak, who agreed to testify only after he had been convicted at an earlier trial and sentenced to a 25-year prison term. Grubczak testified that while on a break from his job during the early morning hours of April 29, 1985, Coffey, whom Grubczak had known for several years, appeared at Grubczak's lower Manhattan apartment and told Grubczak that he had something for Grubczak to open and that Grubczak should bring his lock-picking tools. Following Coffey's instructions, Grubczak met a group of men in a nearby lot, all of whom then attempted to open the back doors of the Wells Fargo armored car.

Unable on their first attempt to pick the locks or force open the doors, Coffey and Grubczak walked along the perimeter of the lot to check its visibility. During that walk Coffey explained that he had hurt his right leg jumping from a platform. In addition, Coffey and Grubczak were observed by Alan Merritt, a truck driver waiting to make a delivery, who knew Coffey and Grubczak from working in the area and noticed that Coffey was dragging his right leg.

Grubczak returned to the armored car and ultimately succeeded in opening the back doors from inside after breaking a window with a sledge hammer. The bags of money were then transferred to a van, in which everyone in the lot departed, except Coffey, who left on foot. Later, Coffey met Grubczak at Grubczak's residence and instructed him to act normally and return to work.

A few days later Grubczak went to the home of one of Coffey's co-defendants and was paid $100,000 in cash. As he was preparing to leave, Grubczak met Coffey, who was just then arriving. Grubczak testified that he spent between $20,000 and $30,000 of the payment and hid the balance at his mother's Chicago residence. After criminal charges were lodged against him, however, Grubczak claimed to have instructed his mother to burn the money.

Jay Goldberg, an attorney, testified that soon after Grubczak was arrested Coffey had appeared at Goldberg's office seeking to obtain legal counsel for Grubczak. After meeting with Grubczak, Goldberg agreed to represent him at a fee of $75,000. Goldberg advised Mrs. Grubczak that if she paid for the fee with cash, he would have to file a currency transaction report and the fact of the cash payment would likely be used by the government at her son's trial. Mrs. Grubczak paid $10,000 of the fee by check.

Several days later, Coffey arrived at Goldberg's office with the $65,000 balance of the fee in cash. Goldberg explained to Coffey that if subpoenaed, he would have to disclose the source of the funds. Coffey indicated he was not concerned. Nevertheless, Goldberg returned the cash two days later to avoid having to file a currency transaction report.

The portion of the prosecutor's rebuttal summation that forms the basis of this appeal concerned the source of the $65,000 in cash delivered by Coffey to Goldberg. In his initial summation, the prosecutor recounted the eyewitness testimony that implicated Coffey in the Wells Fargo robbery and relied upon attorney Goldberg's corroborative testimony. With regard to Coffey's solicitation of Goldberg on behalf of Grubczak, the prosecutor stated,

Why did Joseph Coffey do this for Grubczak, go to all this trouble for this drifter, this, as [defense counsel] told you in his opening statement, this bum, this liar, this thief, this burglar? Why did he go to all this trouble for such a man, * * * a man he knew only as an acquaintance from the social club where Coffey used to go to drink and Grubczak used to work?

Why did Coffey go to this Harvard lawyer, * * * this skilled criminal defense advocate, this $75,000 lawyer? Why? Can there be any other reason, ask yourselves, other than that Joseph Coffey was trying to buy Grubczak's silence through the skill of an expensive attorney?

And we know why. Joseph Coffey had a big interest * * * in insuring that Jef-

frey Grubczak never took the witness stand and testified.

On his own summation, defense counsel attacked the credibility of the government witnesses and argued that the $65,000 cash payment had come not from Coffey, but from Grubczak's share of the robbery proceeds. He urged that it was inconceivable that Grubczak's mother—a "little old lady [from] Chicago who used to steal coal in order to heat the house, * * * who couldn't scrape two quarters together, whose son was facing this time"—would burn the money, and that she must have given the money to Coffey.

On rebuttal, the prosecutor responded to defense counsel's argument in the following fashion:

[Defense counsel] said, and he invoked peals of laughter when he said, "Mr. Grubczak's mother burned the money." And it does stretch credulity a little bit to think of a woman burning $80,000. But what he didn't mention was that Grubczak told his mother to burn the cash, not out of the blue but when she was subpoenaed to appear before the grand jury.

Defense counsel immediately objected on the basis that the trial record contained no evidence of a grand jury subpoena issued to Mrs. Grubczak. Judge Sand, in response, gave the following curative instruction:

It is your recollection that governs. It is the court's recollection—which I give you only for your guidance, you are not bound by it—but that testimony was not adduced at this trial.

As I've indicated, however, your recollection controls.

Defense counsel, in the presence of the jury, then asked that the prosecutor be admonished "not to state matters not in evidence." Judge Sand stated, "No counsel [is] permitted to state matters not in evidence." In his charge to the jury, Judge Sand repeated his instruction that as to matters in evidence the jury's recollection controlled, and he illustrated the point by referring again to the statement about a subpoena to Grubczak's mother.

During a conference in the robing room following the jury charge, defense counsel made an oral application for a mistrial on the ground that rather than saying no such evidence was adduced at *this* trial, Judge Sand should have instructed the jury that no such evidence existed. Judge Sand denied the application and sent the jury to deliberate.

Within ten minutes of retiring to deliberate, the jury sent a note indicating their desire to adjourn for the day and "begin fresh" the next day. Judge Sand granted that request. The next morning, before the jury recommenced their deliberations, Judge Sand conferred with all counsel and inquired whether the prosecutor was satisfied that the trial record contained no evidence of a grand jury subpoena for Mrs. Grubczak. The prosecutor said that he was and responded to Judge Sand's invitation to set forth his basis for making the comment by explaining that

[i]n preparing Mr. Grubczak for testimony, this was part of the material we elicited from him. I had intended to elicit it in the course of his testimony and I thought I had [done so]. I discovered afterward, on reviewing the record, based on the objections, that this was not in there.

I was mistaken. But I believed it was part of the record.

Before the jury resumed its deliberations, Judge Sand gave a further instruction, stating, "That portion of the government's rebuttal argument which relates to a subpoena of Mrs. Grubczak is stricken and you are to disregard it."

Following the trial, Judge Sand reconsidered Coffey's application for a mistrial. In a memorandum decision dated February 10, 1987, Judge Sand again denied the motion, finding that the government had acted in good faith and that Coffey had suffered no prejudice since the evidence as a whole amply supported the verdict and the jury twice received curative instructions.

We hold that the prosecutor's erroneous statement did not cause Coffey such substantial prejudice as to deprive him of a fair trial. The three-part test for assessing

prosecutorial misconduct set forth in *United States v. Modica*, 663 F.2d 1173 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982), when applied to the facts of this case, compels us to affirm Coffey's conviction. Initially, we look to the severity of the misconduct, considering the extent to which it was intentional. *Id.* at 1181. Here, the district court found that the prosecutor had a good faith basis to believe the evidence referred to in his rebuttal summation had already been made part of the record. Coffey presents no argument that this factual finding was clearly erroneous. Furthermore, the error was confined to one sentence in the rebuttal summation of a lengthy trial that was otherwise free of improper remarks. *See id.*

Second, Judge Sand took great pains to cure the ill effects of the misconduct. *See id.* at 1181–82. Twice Judge Sand told the jury that he he could recall no evidence of a grand jury subpoena for Mrs. Grubczak. In addition, before the jury had spent any more time deliberating than necessary to decide to adjourn for the evening, Judge Sand struck the statement from the record and instructed the jury to disregard it. These prompt curative instructions sufficed to eliminate any unfair prejudice that might have resulted from a fact being placed unfairly before the jury. *See, e.g., United States v. Pena*, 793 F.2d 486, 491 (2d Cir.1986); *United States v. Perry*, 643 F.2d 38, 51 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *see also United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir.1986) (presumption that jury will follow limiting instructions) (citations omitted).

Finally, in light of the trial evidence, which included the testimony of two eyewitnesses, one accomplice witness, and one corroborating witness, the misstatement does not undermine our confidence in the jury verdict. *See Modica*, 663 F.2d at 1181. The acquittal of Coffey on the substantive counts and of Coffey's two co-defendants on all counts indicates only that the jury did not place controlling weight on Grubczak's testimony, and would not convict on it without corroboration. However,

Coffey alone had to contend with Goldberg's testimony. Regardless of the source of the cash tendered to Goldberg, Coffey's effort to seek Goldberg's assistance and willingness to pay for most of Goldberg's fee may reasonably be interpreted as showing a keen personal interest in seeking to dissuade Grubczak from testifying for the government. Indeed, as Judge Sand properly noted, "[t]here was no credible evidence which would have suggested [any alternative] motive".

Affirmed.