883 F.2d 1125
 28 Fed. R. Evid. Serv. 466
 UNITED STATES of America, Appellee,
v.
Ralph TUTINO, a/k/a "The General," Salvatore Larca, a/k/a
"Sallie," Leoluca Guarino, a/k/a "Leo," and
Laborio Bellomo, a/k/a "Barney," Appellants.
 Nos. 655, 740, 741, 742, Dockets 88-1231, 88-1301, 88-1302, 88-1303.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1989.
Decided June 29, 1989.
 
 1
 Bruce Cutler, New York City, for Tutino.
 
 
 2
 Christine Yaris, New York City, for Larca.
 
 
 3
 George Santangelo, Santangelo, Santangelo & Cohen, New York City, for Guarino.
 
 
 4
 John L. Poll, Todtman, Hoffman, Epstein, Young, Goldman, Tunick & Poll, New York City, for Bellomo.
 
 
 5
 Adam Hoffinger, Asst. U.S. Atty., Benito Romano, U.S. Atty. for the S.D.N.Y., for appellee.
 
 
 6
 Before OAKES, Chief Judge, MAHONEY, Circuit Judge, and WOOD, District Judge.*
 
 KIMBA M. WOOD, District Judge:
 
 7
 On April 1, 1987, the Government filed a four count indictment naming Ralph Tutino, Leoluca Guarino, Salvatore Larca and Laborio Bellomo. Count One charged Tutino, Larca, Guarino and Bellomo with conspiring to distribute more than one kilogram of heroin, in violation of Title 21, United States Code, Section 846. Count Two charged Tutino, Larca and Guarino with distributing approximately two kilograms of heroin between December 27, 1986 and March 19, 1987, in violation of Title 21, United States Code, Sections 812, 841(a)(1), 841(b)(1)(A) and Title 18, United States Code, Section 2. Count Three charged the same three defendants with distributing approximately 999.2 grams of heroin on December 27, 1986, in violation of Title 21, United States Code, Sections 812, 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2. Count Four charged all four defendants with distributing approximately 997.8 grams of heroin on March 19, 1987, in violation of Title 21, United States Code, Sections 812, 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2.
 
 
 8
 Trial began on January 15, 1988. The Government contended that Ralph Tutino and Leolarca Guarino sold one kilogram of extraordinarily high quality heroin to Vincent "Fish" Cafaro, an organized crime figure,[1] on December 27, 1986 and March 19, 1987, and that Salvatore Larca and Laborio Bellomo supplied Tutino and Guarino with the heroin. The Government's case-in-chief consisted of portions of the consensual tapes made by Cafaro, testimony of numerous surveillance agents, and telephone records showing regular communications among the defendants through beepers, mobile telephones, and public telephones. Tutino and Guarino did not deny that they had sold a kilogram of heroin to Cafaro on each of the dates in question. Instead, they attempted to show that Cafaro had intimidated, threatened and entrapped them into committing the crimes charged. Bellomo attempted to discredit the FBI agents who had observed him; Larca presented no evidence.
 
 
 9
 The trial concluded on March 6, 1988, when the jury returned guilty verdicts on all counts. All four defendants have appealed on various grounds.
 
 DISCUSSION
 
 10
 A. THE SUFFICIENCY OF THE EVIDENCE SUPPORTING LARCA'S CONVICTION
 
 
 11
 Defendant Larca contends that the evidence against him was insufficient as a matter of law to support a conviction. There was clearly sufficient evidence to prove that a conspiracy to distribute heroin existed, and that Tutino and Guarino were part of that conspiracy. The only question, then, is whether there was sufficient evidence to link Larca to that conspiracy. This Court has recently reaffirmed the principle that "[o]nce a conspiracy is shown to exist, the 'evidence sufficient to link another defendant to it need not be overwhelming.' " United States v. Ciambrone, 787 F.2d 799, 806 (2d Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986) (quoting United States v. Provenzano, 615 F.2d 37, 45 [2d Cir.], cert. denied, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 [1980]. In addition, the "[e]xistence of and participation in a conspiracy with the requisite criminal intent may be established ... through circumstantial evidence." United States v. Young, 745 F.2d 733, 762 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) (quoting United States v. Sanzo, 673 F.2d 64, 69 [2d Cir.] cert. denied, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 [1982].
 
 
 12
 The evidence against Larca was more than sufficient to link him with the conspiracy. At the December 16 meeting between Tutino and Cafaro, Tutino told Cafaro that Tutino's suppliers "got mad" because Cafaro had insufficient money with him the previous day, and that they had to "make a move." At the end of that meeting, Tutino said "I gotta go meet these guys." Shortly thereafter, Tutino was observed entering a clothing store, followed almost immediately by Larca. Tutino left the store after only three minutes, and Larca departed three minutes later. When Cafaro met Tutino on December 23, Tutino first said he did not know whether he could do the deal on December 27, because he had not yet seen his supplier. Tutino then said "I gotta walk out ... I gotta see somebody," left, and reentered the store moments later with Larca, saying he could do the deal on December 27. On December 27, a man fitting Larca's description met with Tutino shortly before Cafaro received the heroin from Tutino. The jury could reasonably have concluded that Larca was one of the "guys" that Tutino had to meet on December 16,[2] and that Tutino's sudden ability to go forward with the deal on December 27 was due to his meeting with Larca, who was his supplier.
 
 
 13
 On March 19, the next time Cafaro purchased heroin, Larca was with Bellomo throughout the day. Several calls were made by Bellomo to Larca's beeper. In particular, shortly after the agents observed Bellomo receiving a package from Tutino, Bellomo called Larca's beeper. The jury could reasonably have concluded that Bellomo called Larca to inform him that the transfer had taken place. Moments later, Larca was observed driving a white Camaro with Bellomo in the passenger seat; Larca drove Bellomo to Bellomo's car.
 
 
 14
 The Government also introduced evidence of Larca's substantial use of devices such as beepers and cellular telephones, which are difficult to tap. In addition, during the period in which the narcotics transactions took place, Larca possessed a scanner programmed to almost all the same frequencies as Tutino's, including seven stations programmed to DEA frequencies.
 
 
 15
 Larca points out that Tutino did not explicitly reveal Larca as his supplier. However, Tutino made several references to "Sallie," and in one conversation told Cafaro, "Sallie couldn't even do it. He couldn't give it to me without an okay." The jury could reasonably have concluded that this conversation concerned the supply of heroin, that "Sallie" referred to Salvatore Larca, and that Larca needed an "okay" from someone else to supply the heroin to Tutino.
 
 
 16
 Under Ciambrone, supra, and Young, supra, this evidence is sufficient to convict Larca.
 
 
 17
 B. LARCA'S AND BELLOMO'S MOTION FOR SEVERANCE
 
 
 18
 Larca and Bellomo moved for a severance from Tutino and Guarino before, during, and after trial, on three grounds: (1) antagonistic defenses; (2) prejudicial spillover from the "organized crime" evidence; and (3) the disparity of the evidence.
 
 
 19
 Severance motions are committed to the sound discretion of the district court. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); United States v. Friedman, 854 F.2d 535, 563 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989) (decision on motion to sever "virtually unreviewable"); United States v. Potamitis, 739 F.2d 784, 790 (2d Cir.), cert. denied, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). A denial of a motion to sever will be reversed only if the denial constitutes a "clear abuse of that discretion." United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). To challenge the denial of a severance motion, a defendant must sustain an "extremely difficult burden." United States v. Friedman, 854 F.2d at 563. The defendant must show that he was so severely prejudiced by the joinder that he was denied a constitutionally fair trial, United States v. Burke, 700 F.2d 70, 83 (2d Cir.), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); United States v. Cunningham, 723 F.2d 217, 230 (2d Cir.1983), cert. denied, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); United States v. Rucker, 586 F.2d 899, 902 (2d Cir.1978), and that a "miscarriage of justice" has occurred. United States v. Friedman, 854 F.2d at 563; United States v. Nersesian, 824 F.2d 1294, 1303 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Merely establishing that a defendant would have had a better chance for acquittal at a separate trial is not sufficient to show substantial prejudice. United States v. Friedman, 854 F.2d at 563; United States v. Potamitis, 739 F.2d at 790.
 
 
 20
 To obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved. United States v. Potamitis, 739 F.2d at 790; United States v. Carpentier, 689 F.2d 21, 27-28 (2d Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983). Judge Leval correctly found that Tutino's and Guarino's reliance on the entrapment and coercion defenses did not in any way implicate Larca or Bellomo. Tutino and Guarino admitted selling heroin, but their admission did not necessitate a finding that either Larca or Bellomo was the supplier or was otherwise involved.
 
 
 21
 The defendants' argument regarding prejudicial spillover is meritless. The organized crime evidence was neatly compartmentalized, and Judge Leval repeatedly gave very clear instructions to the jury. Before the unredacted tapes were played in the Government's rebuttal case, Judge Leval instructed the jury that the tapes were being received solely as to defendants Tutino and Guarino. After the tapes were played, the court carefully and clearly specified once again that the tapes and Agent Taylor's testimony were not to be considered against Larca and Bellomo.[3]
 
 
 22
 In the jury charge, Judge Leval again cautioned the jury to consider the evidence separately. First, he gave a general instruction: "You must consider each defendant separately and you must reach a separate decision for each defendant, based solely on the evidence or lack of evidence regarding that particular defendant." Judge Leval also reminded the jury of his specific instructions during the course of the trial. These instructions were repeated during Judge Leval's charge on Tutino's and Guarino's entrapment defense.[4]
 
 
 23
 Finally, when the jury requested the transcripts of all of the tapes admitted in evidence during its deliberations, Judge Leval delivered an exhaustive instruction that could have left no doubt whatsoever that the unredacted tapes offered on the Government's rebuttal case were not to be considered against Larca and Bellomo.[5] It is difficult to envision how the district court's instruction on this point could be made any clearer. These instructions eliminated any possibility of prejudicial spillover. United States v. Teitler, 802 F.2d 606, 617 (2d Cir.1986) (strong presumption that juries can and will follow instructions to consider certain evidence separately); United States v. Potamitis, 739 F.2d at 790.
 
 
 24
 Furthermore, this case was not so lengthy or massive as to render the jury's task of sorting the evidence so difficult as to be almost impossible. This was a seven week trial, involving only four defendants and four counts. Judge Leval reasonably concluded that in this four-defendant case, the jury could distinguish evidence admissible against some but not all defendants. See, e.g., United States v. Cunningham, 723 F.2d at 230 (two defendants not enough to confuse jury); United States v. Carson, 702 F.2d 351, 363 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983) (four defendants is few enough to allow jury to consider each defendant separately).
 
 
 25
 The defendants' argument regarding the disparity of the evidence is also without merit. Differences in the amount of proof are inevitable in multi-defendant trials, and are not in themselves a ground for severance. United States v. Panza, 750 F.2d 1141, 1149 (2d Cir.1984); United States v. Carson, 702 F.2d at 366-67. We find no error in Judge Leval's determination that the conduct of the trial did not warrant a severance; even considered cumulatively, defendants' claims of prejudice are insufficient to require a separate trial.
 
 C. THE USE OF AN ANONYMOUS JURY
 
 26
 Guarino, Larca, and Bellomo claim that the empanellment of an anonymous jury deprived them of a fair trial; they argue that the use of an anonymous jury unfairly prejudiced them, deprived them of the presumption of innocence, and prevented them from selecting a jury in a meaningful way.
 
 
 27
 This Circuit has held that in appropriate circumstances, an anonymous jury is not unconstitutional. See United States v. Persico, 832 F.2d 705, 717-18 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); United States v. Thomas, 757 F.2d 1359, 1363-65 (2d Cir.), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir.1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Although the use of an anonymous jury carries with it numerous risks, "(i)n recent years many trials involving multiple-defendants indicted on racketeering and narcotics charges have been tried to anonymous juries." Hayden v. United States, 814 F.2d 888, 892 (2d. Cir.1987). However, recognizing the possibility of unfair prejudice to the defendant and the danger of encroaching on the presumption of innocence, among other problems, this Court has articulated guidelines for the use of anonymous juries:
 
 
 28
 there must be, first, strong reason to believe that the jury needs protection and, second, reasonable precaution must be taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants.
 
 
 29
 United States v. Thomas, 757 F.2d at 1365.
 
 
 30
 In this case, the Government requested an anonymous jury for five reasons: (1) the defendants faced serious penalties, including substantial prison terms and a possible parole revocation, and, according to the Government, were therefore likely to bribe or threaten the jury; (2) Tutino had attempted to tamper with a jury in a prior trial; (3) Tutino and Guarino were known associates of organized crime figures; (4) Tutino had a prior extortion conviction and Guarino and Larca had prior narcotics convictions; and (5) the jury had to be protected from the media. The Government made a substantial showing that there was a risk of jury tampering. In particular, the Government submitted affidavits demonstrating that at least three jurors in a prior narcotics case had been approached to acquit Tutino and his co-defendants, and that Tutino was personally involved in the jury tampering.[6] This history, coupled with the defendants' serious criminal records (including convictions for narcotics violations, usury and theft of property), was sufficient to justify the empanellment of an anonymous jury. United States v. Thomas, 757 F.2d at 1365 ("Here, there was strong evidence of defendants' past attempts to interfere with the judicial process, and defendants were alleged to be part of a group that possessed the means to harm jurors").
 
 
 31
 In addition, any risk that the empanellment of an anonymous jury might deprive defendants of the presumption of innocence was minimized by Judge Leval's instructions to prospective jurors:
 
 
 32
 It is a common practice followed in many cases in the Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual. It is a procedure being followed in this case. Accordingly, you will note on the front page of the questionnaire you will give your name and all identifying information. But in the remainder of the questionnaire, after that front page, you are not to write your name or the names of any persons you are connected with, or your employer, or your addresses, or any identifying information.
 
 
 33
 Judge Leval also issued instructions regarding the presumption of innocence in the questionnaire distributed to prospective jurors, and during trial. The instructions were carefully framed to avoid any risk that the anonymous procedures would appear extraordinary or reflect adversely on the defendants. See, United States v. Persico, 832 F.2d at 717; United States v. Thomas, 757 F.2d at 1364-65. These instructions were sufficient to ensure that the jury would not draw improper conclusions from the preservation of their anonymity.
 
 
 34
 In addition, the voir dire was sufficient to safeguard the defendants' rights to a fair and impartial jury. The decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial judge. Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981); United States v. Silva, 715 F.2d 43, 50 (2d Cir.1983) (decision as to what questions will be asked will not be disturbed absent a clear abuse of discretion). A trial judge is required to permit at least some questioning with respect to any material issue that may actually or potentially arise during the trial. United States v. Barnes, 604 F.2d at 137. However, although the questioning must be fair, it need not include specific points requested by a particular defendant. United States v. Taylor, 562 F.2d 1345, 1355 (2d Cir.), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). "As long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal." United States v. Barnes, 604 F.2d at 140.
 
 
 35
 Judge Leval conducted an extensive and thorough voir dire. Although the jurors' names, addresses, and places of employment were withheld, the jurors were questioned about their neighborhoods, marital status, employment, spouse's and children's employment, education, ethnic background, military service, and, optionally, religious background, among other things. This probing inquiry was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury.
 
 
 36
 D. EXPERT TESTIMONY ABOUT THE NARCOTICS TRADE AND ORGANIZED CRIME
 
 
 37
 Larca and Bellomo claim that the introduction of DEA Special Agent John DiGravio's and Special Agent Damon Taylor's testimony deprived them of a fair trial. The Government called Agent DiGravio as an expert on the narcotics trade. Agent Taylor testified about organized crime jargon as part of the Government's rebuttal.
 
 
 38
 Rule 702 of the Federal Rules of Evidence permits the admission of expert testimony if the trial judge finds that such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." The district court has "broad discretion" in the matter of the admission or exclusion of expert testimony, and will be affirmed unless the decision is "manifestly erroneous." United States v. Brown, 776 F.2d 397, 400 (2d Cir.1985), cert. denied, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (quoting Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 [1962]; see Hamling v. United States, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974) (district court has wide discretion to admit or exclude evidence, particularly in the case of expert testimony). This Court has repeatedly held that "the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702." United States v. Khan, 787 F.2d 28, 34 (2d Cir.1986). See also, United States v. Carmona, 858 F.2d 66, 69 (2d Cir.1988) (expert evidence as to jargon of drug trade admissible); United States v. Garcia, 848 F.2d 1324, 1335 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989) (same). The use of expert testimony regarding the names, rules, and jargon of organized crime families has been approved by this Court. United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); United States v. Ardito, 782 F.2d 358, 363 (2d Cir.), cert. denied, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986).
 
 
 39
 Bellomo and Larca argue that Agent DiGravio's testimony tracked the fact pattern of this case, and was offered to explain and justify the lack of evidence against them. This contention is contrary to the record. Agent DiGravio testified generally about heroin distribution methods; some of those methods, such as hand to hand transactions and the use of boats and airplanes, were not used by the defendants in this case at all. In addition, the expert testimony did not interpret or draw conclusions from the evidence, and "was not used to explain the absence of any corroborating physical evidence in the government's case, but was instead used to explain physical evidence that was in the case." United States v. Young, 745 F.2d at 761; United States v. Garcia, 848 F.2d at 1324.
 
 
 40
 The testimony of Agent Taylor about organized crime was limited to defining ten terms heard in the tape recording offered by the government in rebuttal. Judge Leval did not abuse his discretion in concluding that Agent DiGravio's and Agent Taylor's testimony was relevant, and that its probative value exceeded any possible prejudice that might result from its introduction.
 
 
 41
 E. THE ADMISSION OF TUTINO'S REDACTED STATEMENT
 
 
 42
 Guarino and Larca argue that the admission of a redacted version of Tutino's post-arrest statement violated their rights of confrontation under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny. Tutino gave the following confession to FBI Agent Robert Leight:
 
 
 43
 [Tutino] told me that he had met Vincent Cafaro and Leo Guarino earlier on the day, on Middletown Road in the Bronx. He stated that Leo Guarino then received keys to a rental car from Vincent Cafaro and they drove a short distance away where they parked the rental car.
 
 
 44
 Tutino stated that he followed Guarino to that area. Tutino said he got a bag of money out of the rental car, took it in his own car and then he drove to Research Avenue in the Bronx and met Sallie Larca. He told me from there they drove to the Pennyfield Avenue section of the Bronx and met an Audi. He said he didn't know who was driving the Audi and received a package ... He stated that Sallie Larca went with the Audi ...
 
 
 45
 He then stated that he returned the car and the package back to Vince Cafaro and went to 15 Poplar Street ... I then asked him about the previous narcotics transaction on December 27, 1986 that he had done with Vince Cafaro and ... Tutino stated that he had met Sallie Larca on Research Avenue in the Bronx and Larca was driving in an Audi and he met Larca and received the package ... He said he gave Larca the money.
 
 
 46
 At trial, the Government introduced a redacted version of Tutino's statement. The redacted statement did not contain the name or identifying characteristics of any co-defendant. Instead, it referred to "others," "other people," and "another person:"
 
 
 47
 Q. What in substance did Mr. Tutino ... say to you?
 
 
 48
 A. (Agent Leight). In substance, Ralph Tutino told me that he and others were involved in 2 heroin transactions on March 19th, 1987 and December 27, 1986. In respect to the transaction on March 19th, 1987, Tutino stated that he had received money from Vincent Cafaro earlier in the day and then had gone on received a package from other people, and then returned that package to Vince Cafaro.
 
 
 49
 Q. Did you ask him about the previous transaction on December 27, 1986?
 
 
 50
 A. Yes. When I questioned him about the previous transaction, he stated that he had obtained the package from another person, and exchanged it for money.
 
 
 51
 This Court has held that a "defendant's Bruton rights [are] violated ... only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence." United States v. Wilkinson, 754 F.2d 1427, 1435 (2d Cir.), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). This principle was recently reaffirmed by the Supreme Court in Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In Richardson, the Supreme Court explicitly rejected a "contextual" approach, focusing on whether the redacted statement itself was "facially incriminating" as to the co-defendant. Id., at 208-09, 107 S.Ct. at 1712-13. Under this analysis, whether a co-defendant's statement would be incriminating when linked with other evidence in this case is not relevant if the statement is not incriminating on its face. Id.
 
 
 52
 This case differs from Richardson only in that Tutino's redacted statement does not completely eliminate any reference to the existence of others, but contains neutral pronouns in place of the names of co-defendants. We hold that a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights. Although the Richardson Court declined to rule on the admissibility of such a redacted confession, the principles set forth by the Supreme Court in Richardson are consistent with prior decisions of this Court and our holding today. See eg., United States v. Wilkinson, 754 F.2d at 1435; United States v. Knuckles, 581 F.2d 305, 313 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). In this case, the jury never knew that Tutino's original statement named names, and could easily have concluded that Tutino did not want to reveal the identity of his coconspirators to the agent. Thus, as to Larca and Guarino, the redacted statement was not incriminating on its face, and its admission did not violate their Bruton rights.
 
 F. THE GOVERNMENT'S REBUTTAL SUMMATION
 
 53
 Bellomo contends that certain of the prosecutor's remarks made during the Government's rebuttal summation deprived him of a fair trial. In his summation, the prosecutor told the jury that Bellomo's counsel knew that Bellomo was involved in the conspiracy:
 
 
 54
 You think it really wasn't Bellomo in that car? You think somebody else got into the car and took off in it?
 
 
 55
 Of course it was Bellomo.
 
 
 56
 He wants you to believe, Mr. Pollok wants you to believe that Mr. Bellomo was in the Audi all day. But he wants you to believe that it was someone else [who] jumped into it at 5:40, someone else met with Tutino and Guarino at 6:06, someone else got out of Larca's Camaro into the Audi at 6:57.
 
 
 57
 Does he want you to believe that there is a Laborio Bellomo look-alike running around? A Laborio Bellomo duplicate or clone? It's preposterous.
 
 
 58
 And you know what, Mr. Pollok knows it. Because if you remember he told you at the end of his summation, he said well, either, it wasn't Bellomo or if it was, it was just what he called mere association.
 
 
 59
 He couldn't take a position on it.
 
 
 60
 Because he knows that it was Bellomo.
 
 
 61
 At trial, Bellomo objected to the words "Because he knows that it was Bellomo." Judge Leval sustained the objection, and immediately issued curative instructions: "The jury will disregard that, it's not a question of what an attorney knows or doesn't know, it's a question of what has or has not been proved in evidence." Moments later, Judge Leval elucidated his instruction:
 
 
 62
 I want to go back also for a second to the objection Mr. Pollok made about which I said something when he made it, but I want to go back to it to make sure there is no misunderstanding.
 
 
 63
 Mr. Hoffinger said something to the effect that Mr. Pollok knows he was there. Now, I want to make it clear that there is no basis whatsoever for any kind of a statement of what Mr. Pollok knows or doesn't know. What I said to you immediately after in sustaining the objection was that it doesn't matter what Mr. Pollok knows or doesn't know, that's not really what I meant. What I meant is, there is absolutely no basis for any statement of what any attorney knows or doesn't know, and you are not to consider anything to do with what any attorney knows or believes or doesn't know, or doesn't believe.
 
 
 64
 The question is for you to focus on the evidence in the case, or the lack of evidence in the case. And on all issues the government has the burden of proof beyond a reasonable doubt.
 
 
 65
 No motion for a mistrial was made.
 
 
 66
 The Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone" in an otherwise fair proceeding. United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); United States v. Biasucci, 786 F.2d 504, 514 (2d Cir.), cert. denied, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). Whether a prosecutor's improper remarks result in a denial of due process depends upon whether the remarks caused "substantial prejudice" to the defendant. United States v. Nersesian, 824 F.2d at 1327; United States v. Modica, 663 F.2d 1173, 1181 (2d Cir.1981), cert. denied, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). In determining whether or not substantial prejudice exists, this Court has "adopted a contextual approach that considers the following factors: 'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.' " United States v. Biasucci, 786 F.2d at 514 (quoting United States v. Modica, 663 F.2d at 1181).
 
 
 67
 Here, although the prosecutor impermissibly referred to information not in evidence (i.e., what a defense lawyer knew about his client's involvement), the prosecutor's misconduct was very minor. His remarks were confined to the summation, and were made in response to defense contentions. The prosecutor never disregarded the district court's instructions, and in fact apologized in front of the jury, which provides some basis for inferring that his remark was unintentional. See United States v. Modica, 663 F.2d at 1181 (one of the factors in determining the severity of the alleged misconduct is the "extent to which the misconduct was intentional").
 
 
 68
 In addition, the likelihood that any prejudice resulted from this solitary remark is extremely remote. The remark came after two days of summations at the very end of a trial that spanned seven weeks. The risk of influencing the jury through one inappropriate remark was therefore minimal. United States v. Sprayregen, 577 F.2d 173, 175 (2d Cir.), cert. denied, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978). In addition, the curative instructions that were given both immediately and moments later were sufficient to eliminate any possible prejudice from the prosecutor's remarks. See, e.g., United States v. Coffey, 823 F.2d 25, 28 (2d Cir.1987); United States v. Pena, 793 F.2d 486, 491 (2d Cir.1986). See also, United States v. Ebner, 782 F.2d 1120, 1126 (2d Cir.1986) (presumption that jury will follow limiting instructions). Thus, the prosecutor's remark did not deprive Bellomo of a fair trial.
 
 
 69
 G. POST-ARREST EVIDENCE ADMITTED AGAINST TUTINO
 
 
 70
 Tutino claims that evidence seized in a search of the home of his girlfriend, Joan Gaetano, as well as Tutino's own post-arrest statements, should not have been admitted. Following Tutino's arrest, Agent Leight knocked on Gaetano's door, identified himself, and informed Gaetano that Tutino had been arrested on narcotics charges. He then told her that he wished to ask her some questions; Gaetano allowed him to enter her home. At that point, Agent Leight informed Gaetano that another agent was in the process of obtaining a warrant to search her home. Gaetano stated that she had nothing to hide and that a warrant would not be necessary; she then signed a consent form. The agents found $2000 in prerecorded buy money in Gaetano's purse. Following a suppression hearing, Judge Leval found that the search was consensual.
 
 
 71
 "[W]hether a consent to search was in fact 'voluntary' ... is a question of fact to be determined from the totality of all the circumstances." United States v. Puglisi, 790 F.2d 240, 243 (2d Cir.), cert. denied, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 [1973]. Judge Leval's finding that the search was consensual is fully supported by the testimony of the agents. Although Gaetano's version of the incident differed, the district court was free to determine that the agents' testimony was more credible. This Court will not overturn a district court's finding that a defendant voluntarily consented to a search unless that finding was "clearly erroneous." United States v. Zapata-Tamallo, 833 F.2d 25, 27 (2d Cir.1987) (citing United States v. Puglisi, 790 F.2d at 244).
 
 
 72
 Defendant's argument that it was coercive for Agent Leight to advise Gaetano that agents were in the process of obtaining a search warrant for her home is meritless. United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir.1983), cert. denied, 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985) (merely advising a person that a search warrant can be obtained does not constitute coercion).
 
 
 73
 Tutino's confession was also properly admitted. On March 19, 1987, Tutino was arrested by two FBI agents, handcuffed, and read his Miranda rights. Having heard the warnings, Tutino nodded his head and said that he understood his rights. He was then seated in the back of an FBI car. The agents informed Tutino that they were going to search Gaetano's home; Tutino responded that the agents could find what they were looking for in the glove compartment of his car. The agents then found $8,000 in prerecorded buy money in the glove compartment of Tutino's car. After the agents searched Gaetano's house and found $2,000 in her purse, they brought Gaetano to the FBI car in which Tutino was being held. The agents informed Tutino that they had received authorization to arrest Gaetano, and asked Tutino "why he wanted to get this woman involved in his narcotics business." Because it was a cold night, Agent Leight continued the discussion inside Gaetano's house, where he informed Tutino of the evidence against him, including the fact that Cafaro was cooperating. Tutino confessed. Tutino acknowledges that he received his Miranda warnings. However, he contends that there was no express waiver of his rights after he received the Miranda warnings, and that the circumstances under which the incriminating statements were made were inherently coercive.
 
 
 74
 The district court's finding that Tutino waived his Miranda rights must be upheld "if any reasonable view of the evidence supports it," and "any specific findings of fact made after a hearing are binding unless clearly erroneous." United States v. Hall, 724 F.2d 1055, 1060 (2d Cir.1983) (quoting United States v. Kiendra, 663 F.2d 349, 351 [1st Cir.1981]. We find no error in Judge Leval's ruling that Tutino understood his rights and knowingly and voluntarily waived them. The Supreme Court has noted that in some circumstances, an "express statement is [not] indispensable to a finding of waiver." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); United States v. Hall, 724 F.2d at 1060. Here, although Tutino did not affirmatively state that he wished to confess, he nodded his head and said "yes" when asked if he understood his rights. In addition, Tutino, who has a long history of arrests and convictions, told Agent Leight: "[y]ou do what you got to do ... I do what I got to do ... we all know our roles."
 
 
 75
 Tutino also claims that the agents' conduct was inherently coercive. The test of voluntariness of a confession is whether all the relevant circumstances show that the conduct of law enforcement officials "was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." United States v. Ferrara, 377 F.2d 16, 17 (2d Cir.), cert. denied, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967) (quoting Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 [1961]. "A district court's factual findings with respect to such circumstances are not to be set aside unless clearly erroneous." United States v. Guarno, 819 F.2d 28, 30 (2d Cir.1987). Judge Leval properly found that the agents' conduct was not inherently coercive. Once Tutino had been advised of his rights, the agents were free to discuss with him the evidence against him and the reasons why he should cooperate. United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir.), cert. denied, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974). We find no error in Judge Leval's determination that Tutino's confession was voluntary.
 
 
 76
 H. THE GOVERNMENT'S REBUTTAL CASE AGAINST TUTINO AND GUARINO
 
 
 77
 Tutino and Guarino argue that Judge Leval erred in allowing the Government to introduce certain evidence as part of the Government's rebuttal. In their defense case, Tutino and Guarino claimed that Cafaro had intimidated, threatened and entrapped them into selling heroin. In rebuttal, the Government introduced the defendants' prior convictions and portions of tapes linking Tutino and Guarino to organized crime, as evidence of the defendants' predisposition to commit the crime, and as proof that they were not intimidated or coerced by Cafaro.
 
 
 78
 On the issue of predisposition, a jury "may consider evidence of the prior conduct of a defendant, including his criminal record, if any." United States v. Dyman, 739 F.2d 762, 770 (2d Cir.1984), cert. denied, 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985). Indeed, the Supreme Court long ago established the rule permitting the use of bad acts to show predisposition. In 1932, the Court stated that a defendant who seeks acquittal by reason of entrapment:
 
 
 79
 cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense.
 
 
 80
 Sorrells v. United States, 287 U.S. 435, 451-52, 53 S.Ct. 210, 216-17, 77 L.Ed. 413 (1932). Character evidence is likewise admissible to rebut a defense of intimidation and threats, and to demonstrate the absence of compulsion. United States v. Murzyn, 631 F.2d 525, 529-30 (7th Cir.1980), cert. denied, 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981).
 
 
 81
 We see no error in Judge Leval's admission of the challenged evidence. Guarino's 1974 heroin distribution conviction was admissible under Rule 404(b) of the Federal Rules of Evidence, which has no date requirement, and under Rule 609(b) of the Federal Rules of Evidence, which has a 10-year limitation on the use of convictions. Rule 609(b) provides that the time limitation shall run from the later of the date of conviction or the date of release from confinement; Guarino was released on parole in 1979. Similarly, Tutino's October, 1979 conviction of extortion through the use of threats of "physical injury or death" was admissible to rebut Tutino's claim that he was coerced by Cafaro. Furthermore, Judge Leval correctly found that the organized crime tapes were relevant to the issues of predisposition and state of mind, once Tutino and Guarino had asserted that they were afraid of Cafaro because of his reputation as an organized crime figure.
 
 I. THE TESTIMONY OF CAFARO
 
 82
 Tutino and Guarino subpoenaed Vincent Cafaro to testify at trial. At the time he testified, Cafaro's cooperation agreement with the Government had been rescinded, and he faced racketeering charges. Accordingly, he invoked the Fifth Amendment with respect to matters not covered by the tape recordings he had made between December 4, 1986 and March 19, 1987. Subsequent to his trial testimony, on April 29, 1988, Cafaro testified before the Senate Permanent Subcommittee on Investigations, despite the fact that he still had no agreement with the Government and had not been given immunity. On the basis of Cafaro's Senate testimony, Tutino and Guarino moved to dismiss the indictment or for a new trial, on the theory that the Government had induced Cafaro to assert the privilege at trial and that the Senate testimony constituted "newly discovered" evidence. Judge Leval denied the motion.
 
 
 83
 1. Cafaro's Invocation of the Fifth Amendment
 
 
 84
 Tutino argues that Judge Leval improperly upheld Cafaro's invocation of the privilege, thereby restricting the areas about which Cafaro could be compelled to testify. Judge Leval's ruling was completely consistent with the law in this Circuit. In United States v. Zappola, 646 F.2d 48, 53 (2d Cir.1981), we held that an individual who has cooperated with the Government has no bona fide fear of incrimination with respect to the subject of his cooperation and therefore "cannot legitimately invoke the privilege against self-incrimination as to questions of limited scope dealing solely with those activities." However, the fact that an individual has cooperated with the Government does not abrogate that person's Fifth Amendment privilege with respect to any and all questions relating to his cooperation. We indicated in Zappola the types of responses that are required:
 
 
 85
 [The witness] should have been required to respond to some carefully phrased, limited questions by defense counsel concerning the time and place of the meetings, the persons with whom he met, that conversations were tape recorded, what the substance of the conversations was, and who said what. Responses to questions concerning the purpose of the meetings or a summary of prior circumstances may not be required because such information may furnish a link in the chain of evidence needed to prosecute [the witness] for criminal conduct.
 
 
 86
 Id., at 54. Judge Leval conducted the necessary particularized inquiry, and required Cafaro to testify about the tapes he made for the Government; however, he correctly concluded that Cafaro had a legitimate fear of prosecution in other areas, such as his prior activities leading to his cooperation with the Government. Accordingly, Cafaro's invocation of the privilege was appropriate under Zappola.
 
 
 87
 Tutino next claims that the Government should have granted Cafaro immunity. The law, however, is clear that "[v]ery few situations will impose a duty on the Government to grant a defense witness immunity." United States v. Shandell, 800 F.2d 322, 324 (2d Cir.1986). As we explained in Shandell:
 
 
 88
 To warrant an immunity request, it must be shown that "the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; and ... the witness' testimony will be material, exculpatory and not cumulative and is not obtainable from any other source."
 
 
 89
 Id. (quoting United States v. Burns, 684 F.2d 1066, 1077 [2d Cir.1982], cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 [1983]. No such showing was made here.
 
 
 90
 The immunity conferred on Cafaro by virtue of his cooperation agreement was properly withdrawn when Cafaro rescinded that agreement three months before the start of this trial. Furthermore, nothing in the record indicates that the Government "forced" or "coerced" Cafaro to invoke the privilege. Tutino's other arguments with respect to Cafaro's invocation of the privilege are without merit.
 
 2. Cafaro's Subsequent Senate Testimony
 
 91
 To obtain a new trial based on newly discovered evidence, Tutino must demonstrate that there exists new evidence that would probably lead to an acquittal. United States v. Gilbert, 668 F.2d 94, 96 (2d Cir.1981), cert. denied, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982). Evidence that would be offered solely to further impeach a witness whose character has already been shown to be questionable does not meet this standard. Id. At trial, defendants elicited testimony about Cafaro's reputation as a feared "mobster," the finding of two federal courts that Cafaro was a danger to the community, and testimony and newspaper reports about Cafaro's connection with, and activities conducted with, the Genovese crime family. Thus, Cafaro's Senate testimony would be offered solely to impeach Cafaro, a witness whose credibility had already been severely attacked. This is insufficient to warrant a new trial.
 
 J. THE RESTRICTION ON CROSS-EXAMINATION
 
 92
 Tutino and Guarino contend that the district court improperly restricted the scope of cross-examination at several points during trial. This argument is meritless. The scope and extent of cross-examination lie within the discretion of the trial judge. United States v. Blanco, 861 F.2d 773, 781 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989); United States v. Pedroza, 750 F.2d 187, 195 (2d Cir.1984), cert. denied, 479 U.S. 842, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986). A trial judge's evidentiary rulings will not be disturbed unless the judge acted "arbitrarily or irrationally." United States v. Blanco, 861 F.2d at 781. See also, United States v. Jamil, 707 F.2d 638, 642 (2d Cir.1983) (trial court's evidentiary rulings will not be overturned absent a clear showing of abuse of discretion).
 
 
 93
 The district court's exercise of its discretion is guided by Fed.R.Evid. 611, which instructs the trial court to supervise the "mode ... of interrogating witnesses" so as to make the presentation effective for "the ascertainment of the truth" and "to avoid needless consumption of time." To achieve those goals and to administer justice efficiently and effectively, the district court is vested with "broad discretion over the scope of cross-examination [cite omitted], and [this Court] will not overturn an exercise of that discretion absent a clear showing of abuse." United States v. Bari, 750 F.2d 1169, 1178 (2d Cir.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985) (citations omitted). Judge Leval's rulings were well within his discretion to control the scope and extent of cross-examination.
 
 K. THE ELECTRONIC SURVEILLANCE
 
 94
 During the investigation, the Government obtained a duplicate or "clone" beeper that revealed the numbers displayed on a beeper used by Tutino. Tutino argues that the evidence obtained from the clone beeper should have been suppressed because the Government improperly failed to minimize the interceptions as required by Title 18, United States Code, Section 2518(5), and because the affidavits in support of the applications did not show probable cause or demonstrate the inadequacy of normal investigative techniques.
 
 
 95
 The district court was correct in concluding that the minimization requirement cannot reasonably be applied to clone beepers. Unlike telephone wiretaps, duplicate paging devices reveal only numbers, not the content of conversation. In this way they are similar to pen registers. Because it is impossible to tell from the clone beeper whether a conversation even took place, much less the content of any conversation that might have taken place, traditional minimization requirements do not apply. Tutino's arguments that the order was not supported by probable cause and that the affidavits did not sufficiently set forth the failure of alternative investigative techniques are without merit.
 
 L. AGGREGATION
 
 96
 Defendants challenge the aggregation of two heroin sales in Count Two of the indictment. Count Two charged an offense involving more than one kilogram under Title 21 U.S.C. Sec. 841(b)(1)(A) which provides a mandatory minimum sentence of ten years (twenty years if the defendant, like Guarino, has a prior felony narcotics conviction), and a potential maximum of life imprisonment. Title 21 U.S.C. Sec. 841(b)(1)(B), applicable to sales of heroin under one kilogram, provides for a mandatory minimum of five years (ten years in the case of a prior conviction), and a maximum of forty years (or life).
 
 
 97
 Aggregation to meet jurisdictional amounts has been upheld where a relationship between the various offenses can be shown. Schaeffer v. United States, 362 U.S. 511, 517, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). This Circuit has held that acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme. See, United States v. Margiotta, 646 F.2d 729, 733 (2d Cir.1981), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible. Id.
 
 
 98
 Judge Leval properly found that Guarino and Tutino were involved in an ongoing and continuous drug conspiracy, and that the two sales were part of a single continuing scheme.
 
 M. GUARINO'S MOTION TO APPEAR AS CO-COUNSEL
 
 99
 This Court has held that a criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney. Ennis v. LeFevre, 560 F.2d 1072, 1075 (2d Cir.1977), cert. denied, 435 U.S. 976, 98 S.Ct. 1625, 56 L.Ed.2d 70 (1978); United States v. Cyphers, 556 F.2d 630, 634 (2d Cir.), cert. denied, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977). The decision to grant or deny "hybrid representation" lies solely within the discretion of the trial court. O'Reilly v. New York Times Co., 692 F.2d 863, 869 (2d Cir.1982); United States v. Swinton, 400 F.Supp. 805, 806 (S.D.N.Y.1975). Guarino offered no compelling reason to justify his appearance as co-counsel, and Judge Leval's concern that Guarino could use his role as co-counsel to testify without taking the stand was well founded. Denial of Guarino's motion was within the sound exercise of Judge Leval's discretion.
 
 N. OTHER CLAIMS
 
 100
 We have carefully examined defendants' other claims and find them to be without merit.
 
 CONCLUSION
 
 101
 Accordingly, the judgment of the district court is hereby AFFIRMED.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 At the time of the sales, Cafaro was cooperating with the Government; he was no longer cooperating when the case went to trial
 
 
 [2]
 Larca claims he was misidentified, because surveillance agent Richard Vega described Larca as 5' 10" tall, and of medium build; in fact Larca stands between 5" 6" and 5' 7", and weighs 128 pounds. At trial, however, Agent Vega unequivocally identified Larca as the person he saw on December 16. In addition, Larca arrived on December 16 in a Cadillac registered to Larca's mother-in-law, a car which he was seen driving on February 11 and March 19
 
 
 [3]
 Members of the jury, the first thing that I want to advise you of is that the evidence which you heard while Special Agent Taylor was on the witness stand, including both the testimony of Special Agent Taylor and the tapes that were played while he was on the witness stand, that evidence is received only with respect to the defendants Tutino and Guarino. It is it was not offered with respect to the defendants Larca and Bellomo
 I have to qualify that in one respect. When the tapes were played, part of what was played to you was new material which you hadn't heard the first time you heard the tapes. The other part was the repetition of what you had heard the first time. If you recall, the first time I played--the government played the tapes to you, I instructed you that those tapes included only part of what was on the entire tape, that some of it had been left out and at that time it was not pertinent for your consideration.
 To the extent that you heard once again the old part, that part was received originally against all 4 defendants and is still in the case against all 4 defendants. To the extent that new material was played to you just now when Agent Taylor was on the stand, in other words, to the extent that the conversations played to you went beyond the part that had been played before, included new parts of that conversation, that part is received only against the defendants Tutino and Guarino, and not against the defendants Larca and Bellomo.
 Furthermore, the testimony of Agent Taylor was pertinent only to the defendants Tutino and Guarino, and not to the other 2 defendants.
 
 
 [4]
 When evidence was received on the issue, on the question of the predisposition of the defendants Tutino and Guarino, during the government's rebuttal case, I instructed you that you may not consider that evidence against the defendants Larca and Bellomo. I repeat, that such evidence may be considered by you only on the question of the predisposition of the defendants Tutino and Guarino, it may not be considered by you at all with respect to the defendants Larca and Bellomo. It's not part of the evidence in their cases
 
 
 [5]
 Now, in the early part of the case when the government was presenting it's [sic] evidence in order to prove--in order to offer proof to the jury of the commission of narcotics offenses, the offenses that are named in Counts One through Four, the black books came into evidence. I told you at the time that the government had requested permission to put into evidence the entire conversations. But I had ruled at that time, no, only the portions of the conversations that are directed to demonstrating that narcotics transactions took place, only those portions are going to be received in evidence at this time
 And so the black books came into evidence. And I explained to you when they came into evidence that they did not include the entire conversation that was on the tape, they included only extracts from the conversations that were on the tape.
 After the government's direct case was finished, came the opportunity for defendants to offer evidence. And at that time the defendants Tutino and Guarino put in evidence raising the issue of entrapment in this case.
 After the defendants [sic] case the government, on its rebuttal case then introduced additional portions of some of the conversations for the purpose of giving you evidence on the issue whether the defendants Tutino and Guarino were predisposed to commit the offenses at the time that they met with Cafaro.
 The [blue] books contain some of the same conversations that were in the black books. Some of what is in the blue book exactly repeats some of the conversations that are in the black books. But the blue books include additional portions of those conversations. And those new parts of the conversations, parts that didn't appear in the black books, have to do only with the issue whether the defendants Tutino and Guarino were predisposed to commit the offenses when they met with Cafaro. Those new parts may be considered only as to Tutino and Guarino. They are not evidence in the case involving Bellomo and Larca.
 Now, to be sure that you don't get confused about that, I think the best way to handle it is the following, when you are considering the evidence as to the defendants Bellomo and Larca, to determine whether they committed the offenses charged as to these drug transactions, use only the black books.
 Don't use the blue books at all, when you are looking at the evidence to determine whether the government has proved the guilt of Larca and Bellomo beyond a reasonable doubt.
 When you are considering the cases of the defendants Tutino and Guarino, then you would use both the blue books and the black books.
 All of the conversations and all the portions of the conversations are admissible and are part of the evidence concerning the defendants Tutino and Guarino.
 If you follow that practice, then you will be assured of not using evidence that was received solely on the issue of the predisposition of Tutino and Guarino. Evidence that is not received in the case against Bellomo and Larca, against those two defendants. Don't use the blue books at all when you're looking to decide what was the evidence against Larca and Bellomo.
 
 
 [6]
 Indeed, in United States v. Barnes, 604 F.2d at 134 n. 3, 135, this Court cited United States v. Tutino, 419 F.Supp. 246 (S.D.N.Y.1976), as an example of the "sordid history" of attempts at influencing witnesses and jurors in multi-defendant narcotics cases and the need for protection of prospective jurors, including assuring jurors complete anonymity