UNITED STATES of America, Appellee,

v.

BENITEZ, et al., Defendants.

Appeal of Alfredo PERALTA–MATOS,
Defendant–Appellant.

No. 323, Docket 89–1220.

United States Court of Appeals,
Second Circuit.

Argued Nov. 3, 1989.

Decided Dec. 5, 1990.

Gerald J. DiChiara, New York City, for defendant-appellant.

Peter B. Sobol, Asst. U.S. Atty., S.D. N.Y., New York City (Benito Romano, U.S. Atty., Vincent L. Briccetti, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before MINER and MAHONEY, Circuit Judges, and CARMAN, Judge.[*]

MAHONEY, Circuit Judge:

Defendant-appellant Alfredo Peralta–Matos ("Matos") appeals from a judgment of conviction entered May 24, 1989 in the United States District Court for the Southern District of New York, Robert W.

Sweet, *Judge*, after a jury found Matos guilty of (1) conspiring to distribute, and to possess with intent to distribute, over 500 grams of cocaine in violation of 21 U.S.C. § 846 (1988); (2) distributing, and possessing with intent to distribute, together with codefendants approximately 1,007 grams of cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) (1988) and 18 U.S.C. § 2 (1988); and (3) possessing with intent to distribute approximately 0.844 grams of heroin in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C) (1988) and 18 U.S.C. § 2 (1988).

For the reasons that follow, we affirm the judgment of conviction.

## Background

The convictions from which Matos appeals arise from a narcotics transaction between the indicted defendants and agents of the Drug Enforcement Administration ("DEA"). The government's evidence at trial is summarized immediately hereinafter. Except for one character witness for a codefendant of Matos, no defense case was presented.

In December 1987, DEA agent Thomas C. Slovenkay, working in an undercover capacity, had several telephone conversations with one Eugene Jimenez that culminated in a transaction at 161st Street and the Grand Concourse in the Bronx, New York City, on December 29, 1987 at which Slovenkay purchased from Jimenez approximately 52.6 grams of 63% pure cocaine for $2,500 in prerecorded currency. Following the sale, Jimenez went to an apartment building at 2230 University Avenue in the Bronx. At a later date, Slovenkay received a telephone message from Jimenez requesting that Slovenkay phone Jimenez at a number listed to one Harry Torres at that address.

In a telephone conversation recorded by DEA agents on January 13, 1988, Jimenez and Torres agreed to sell Slovenkay a kilogram of cocaine in exchange for $23,500. In view of the increased magnitude of the

[*] The Honorable Gregory W. Carman, Judge of the United States Court of International Trade, sitting by designation.

transaction, the sale was to be carried out in four equal installments. The next day, Slovenkay and Jiminez talked on the phone and agreed to consummate the sale that evening.

At approximately 8:00 p.m. that evening, January 14, 1988, Matos drove up to the entrance of 2230 University Avenue, parked, and entered the building. Jimenez arrived and entered the building at approximately 8:25 p.m. Matos departed at approximately 8:35 p.m. Shortly thereafter, Jimenez, Torres, and William Gonzalez–Benitez ("Benitez") departed the building, took a cab to 2845 University Avenue, and entered an apartment building at that address.

At some point later in the evening, Jimenez and Slovenkay met at 161st Street and the Grand Concourse. Pursuant to their prior agreement, Slovenkay gave Jimenez the first installment of $5,900 in prerecorded currency. Jimenez thereupon returned to 2845 University Avenue to pick up the cocaine. At approximately 10:00 p.m., Matos also entered 2845 University Avenue.[1]

Meanwhile, Slovenkay waited for Jimenez to return with the cocaine. Slovenkay spoke over the telephone with Jimenez' wife, Renee, several times during that period, and was advised by Renee that "some unforeseen problem had developed from the people that were involved in this thing," and that Slovenkay would "have to sit and wait." At approximately 10:00 p.m., Renee advised Slovenkay that Jimenez "said he'll be there in ten minutes." About ten minutes later Jimenez did arrive, bearing a kilogram of cocaine wrapped in a brown paper bag, a plastic container, and plastic wrapping. Slovenkay testified that Jimenez "apologized[,] saying that instead of going ahead and continuing with the breaking up in four, I brought the whole thing." There was affixed to the paper bag a Sears and Roebuck label addressed to "William Beniter [sic], 2845 University Avenue, Apartment 4J, Bronx, New York."

Jimenez gave the cocaine to Slovenkay, and was thereupon arrested by DEA sur-

veillance agents. Agents then went to Apartment 4J at 2845 University Avenue and, under what the district court deemed to be exigent circumstances, see *United States v. Matos–Peralta*, 691 F.Supp. 780, 784–85 (S.D.N.Y.1988), forced their way in by breaking down the steel door to the apartment with a sledgehammer. The agents found Torres and Benitez inside, and arrested them. Matos and Hector B. Ramirez, who had also been inside, had jumped through the back window of the apartment. Ramirez lay on the ground below; Matos was found at the end of a trail of blood leading to the building's basement utility room. The agents arresting Matos found on the ground in the utility room, where Matos was standing at the time of his arrest, a package containing a sample of 0.333 grams of 86% pure heroin and glassine envelopes containing 17% pure heroin.

Matos and Ramirez were brought to the Bronx Municipal Hospital Center for treatment of the injuries that they sustained in their four-story plunge. Both stated to hospital personnel that they had jumped from an apartment window upon the arrival of police officers. Benitez gave and signed a postarrest statement in which he acknowledged, *inter alia*, that at 9:00 p.m. on January 14, 1988, in Apartment 2A, 2230 University Avenue ("Apartment 2A"), he had agreed with Jimenez to the use of Benitez' Apartment 4J, 2845 University Avenue ("Apartment 4J") to "make some money fast," and that he and Jimenez had then traveled by cab from 2230 University Avenue to 2845 University Avenue. Benitez further stated that a "black guy" with a beard had been at Apartment 2A, had departed to "go get that" saying "he would see us later," and had reappeared at Apartment 4J with a "small Spanish male" with a package, "the evidence we have now." Benitez added that when the DEA agents announced their presence at Apartment 4J, "the black guy and the Spanish guy went to the bedroom and I heard breaking glass." Benitez' statement was admitted

1. DEA Agent James M. Kerrigan so testified, but his written report of his activities that evening states that Matos arrived at 2845 University Avenue at approximately 9:00 p.m.

in evidence at trial, but was redacted to delete any reference to the "black guy," the "small Spanish male," and the "Spanish guy," as indicated in the margin.[2]

Subsequent to their forced entry, the DEA agents executed a search warrant at Apartment 4J. The search yielded cocaine, heroin, marijuana, various narcotics paraphernalia, cutting agents, weapons, ammunition, holsters, address books, and a flight jacket that Matos was wearing when he entered the building. The agents found beepers on the persons of Torres and Benitez. The address books included listings, with telephone numbers, for "Alfredo" and "Fredo."

That same evening, DEA agents also executed a search warrant at Apartment 2A. There they seized heroin, cocaine, narcotics paraphernalia, cutting agents, an address book, narcotics transaction records, and $10,425 in United States currency that included prerecorded currency from the December 29, 1987 and January 14, 1988 transactions between Jimenez and Slovenkay. The narcotics transaction records included an index card headed "Alfred" with a running tally of dollar amounts listed thereunder.

On May 16, 1988, an eleven-count superseding indictment, the first to name Matos as a defendant, was filed against Matos, Ramirez, Torres, Benitez, and Jimenez. Matos was charged only in counts one, three, and eleven. Count one charged that Matos and his codefendants conspired to distribute, and to possess with intent to distribute, over 500 grams of cocaine in violation of 21 U.S.C. § 846 (1988). Count three charged that Matos and his co-defendants distributed, and possessed with intent to distribute, approximately 1,007 grams of cocaine on or about January 14, 1988 in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) (1988) and 18 U.S.C. § 2 (1988). Count eleven charged that Matos possessed with intent to distribute approximately 0.844 grams of heroin on January 14, 1988 in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C) (1988) and 18 U.S.C. § 2 (1988).

After warrants were issued for their arrest, Matos surrendered to the authorities on April 15, 1988, and Ramirez was arrest-

**2.** The text of Benitez' unredacted written statement was as follows:

Q. Are you a heroin addict?
A. Yes, snorting.
Q. Are you high from heroin now?
A. No.
Q. What time were you at apartment 2A in 2230 University Avenue, Bronx?
A. 9:00 p.m.
Q. What happened?
A. I got there and Jimmie got there.
Q. Jimmie, the other defendant?
A. Yes.
Q. Then what happened?
A. Jimmie started making phone calls *and then the black guy with the beard showed up at apt. 2A.*
Q. *Is this the same black guy that jumped out of the window at 4J, 2845 University Avenue?*
A. *Yes.*
Q. Then what happened?
A. Jimmie asked me if I wanted to make some money fast. I said yes. I asked him what I had to do. Jimmie then said he had to use my apartment 4J. I then said OK. Jimmie then called a cab and me Jimmie and Harry went to 4J.
Q. *What happened to the black guy?*
A. *He left before us and told us he would see us later.*
Q. *Do you know why he left?*

A. *Yes. Jimmie asked him are you gonna go get that? The black guy said yes. Jimmie then gave the black guy (I think he's Dominican) the address.*
Q. What happened after you were in 4J?
A. *The black guy showed up with another small Spanish male who also jumped out the window. The black guy took a package out of a black nylon bag and handed it to Jimmie.*
Q. Was the package the evidence we have now?
A. Yes.
Q. *What happened then?*
A. *The Spanish guy had a gun under his coat and was just watching everything that was happening. Jimmie told the black guy he (Jimmie) would be back with the money. Then you knocked on the door. When you yelled police the black guy and the Spanish guy ran to the bedroom and I heard breaking glass and then you guys arrested me.*
Q. Is the reason I wrote this statement for you because you cannot write well?
A. Yes.
As redacted for admission in evidence at trial, the italicized portions of the above statement were deleted. In addition, the question "Was the package the evidence we have now?" was rephrased to read: "Was the package, in the evidence we have now, brought to apartment 4J?"

ed on or about May 24, 1988. On the latter date, Ramirez gave an oral statement to agents at a DEA office recounting the events of the night of January 14, 1988. The statement, given in Spanish, was translated and transcribed by Anthony Petrino, a Spanish-speaking DEA agent.[3]

That night, Ramirez stated, he had driven Matos to 2845 University Avenue and remained in the car while Matos went inside. After waiting for approximately one hour, Ramirez became concerned for Matos' safety and entered the building. He was directed to Apartment 4J by a teenager who "asked him if Ramirez was looking for Matos." When he went into the apartment, Ramirez saw two unknown persons and Matos, together with a machine gun on a table that Ramirez thought was a toy. Shortly thereafter, there was a knock on the door; looking through a peep-hole, Ramirez saw an Indian boy who said "they are not going to kill you." Ramirez, not knowing police were at the door, jumped through the glass and out the bedroom window.

At trial, Ramirez' transcribed statement was not admitted in evidence. Rather, Petrino testified as to the interview with Ramirez, substituting for all references to Matos in the interview the designation of an unspecified "friend" of Ramirez. In addition, Petrino's testimony varied from the original transcription in that Petrino testified that he was somewhat confused whether Ramirez stated that he was told the people seeking entrance to apartment 4J would, or would not, kill Ramirez.

Prior to trial, Matos moved for severance pursuant to Fed.R.Crim.P. 14, contending that the admission of postarrest statements by codefendants would have an unduly prejudicial effect upon his defense. In a published opinion, the district court denied this and various other motions of the defendants. *See Matos–Peralta*, 691 F.Supp. at 782. The court's opinion indicated that a postarrest statement by codefendant Jiminez might be admitted in redacted form at trial, but that there was no need to redact Benitez' postarrest statement; the opinion did not discuss Ramirez' postarrest statement. *See id.* at 790. As indicated hereinabove, however, the statements of Benitez and Ramirez were ultimately admitted in redacted form.

The joint trial of Matos, Ramirez, and Benitez was held in September 1988,[4] and concluded with jury verdicts finding Matos and Benitez guilty on all counts in which they were named. Ramirez was acquitted. After trial, Benitez and Matos moved for judgments of acquittal notwithstanding the verdict pursuant to Fed.R.Crim.P. 29, or, in the alternative, for new trials pursuant to Fed.R.Crim.P. 33.

Matos contended that Petrino's testimony regarding Ramirez' postarrest state-

---

**3.** The agent's contemporaneous English translation of Ramirez's unredacted oral statement was as follows:

On the night of January 14, 1988, Ramirez was in the vicinity of 192nd Street and St. Nicholas Avenue looking for work. At the time, Ramirez was driving a light blue buick which was loaned to Ramirez by Manuel LNU. As Ramirez was driving, he (Ramirez) noticed Alfredo Matos standing on the corner. Alfredo entered Ramirez's car and both drove to 2845 University Avenue Ave. [sic] in the Bronx, N.Y. Matos entered 2845 University Avenue and Ramirez waited outside in the car.

After approximately one hour, Ramirez, concerned with the well-being of Matos, entered 2845 University Ave. and went to Apartment 4. Ramirez did not know which letter the Apartment was.

S/A Kerrigan asked Ramirez how he (Ramirez) entered the building, as the front door was locked, and how did Ramirez know what apartment Matos was in. Ramirez stated that a teenager had opened the door. Once inside, the teenager asked Ramirez if he (Ramirez) was looking for Matos. Ramirez answered yes and the boy escorted Ramirez to Apartment 4J.

Ramirez entered and immediately noticed two unknown people and Matos in the apartment, along with a machine gun on the table. Ramirez thought the gun was a toy.

Shortly after there was a knock on the door. Ramirez peered through the peep-hole and saw an Indian boy who told Ramirez, they are not going to kill you. Ramirez, not knowing the police were at the door, jumped out the bedroom through the glass.

**4.** Jimenez and Torres each pled guilty to one count of the superseding indictment prior to trial.

ment was improperly admitted into evidence at trial; he further contended that the evidence at trial was insufficient to support his conviction. In an unpublished opinion dated April 7, 1989, the district court denied the posttrial motions. Matos was subsequently sentenced to seventy-two months' imprisonment, to be followed by a four-year term of supervised release, but was allowed to remain at liberty pending appeal.

Matos thereupon took this appeal.[5]

### Discussion

We address Matos' contentions that: (1) his trial should have been severed; (2) the admission of the redacted statements of codefendants Benitez and Ramirez violated Matos' rights to a fair trial in various ways; and (3) the evidence was insufficient to support Matos' conviction on the cocaine counts.

### A.  Severance.

Prior to trial, Matos and his codefendants moved for severance pursuant to Fed.R. Crim.P. 14 on the ground that the "use at trial of their co-defendants' post-arrest statements [would] be prejudicial to their individual defenses." *Matos–Peralta,* 691 F.Supp. at 789. Rule 14 provides in pertinent part: "If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires."

■ "The decision whether to grant a severance ... is 'committed to the sound discretion of the trial judge.'" *United States v. Torres,* 901 F.2d 205, 230 (2d Cir.1990) (quoting *United States v. Casamento,* 887 F.2d 1141, 1149 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990)); *see also United States v. Villegas,* 899 F.2d 1324, 1346 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *United States v. Chang An–Lo* 851 F.2d 547, 556 (2d

Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Indeed, the exercise of that discretion is " ' "virtually unreviewable." ' " *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988) (quoting *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.) (quoting 8 J. Moore, *Moore's Federal Practice* ¶ 14.02[1], at 14–3 (2d ed. 1977)), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978)), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). We will reverse a denial of a motion for severance only upon a showing that the defendant has been " 'den[ied] ... a fair trial ..., not that he might have had a better chance for acquittal at a separate trial.'" *United States v. Burke,* 700 F.2d 70, 83 (2d Cir.) (quoting *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir.1978)), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *see also Villegas,* 899 F.2d at 1346 ("This is a heavy burden, requiring a showing that a 'miscarriage of justice' has occurred.") (quoting *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984)).

■ Applying these principles, it is clear that the district court acted well within its discretion in denying severance to Matos. As we hereinafter conclude, the court committed no error in its treatment of the challenged statements of Matos' codefendants, the primary basis for Matos' application for severance. Furthermore, the requirements of Fed.R.Crim.P. 8(b) for joinder of defendants were amply satisfied. *See United States v. Turoff,* 853 F.2d 1037, 1043–44 (2d Cir.1988). The gist of Matos' contention, to the extent that it does not rest upon alleged *Bruton* violations which we hereinafter reject, is that he and his codefendants had antagonistic defenses. As we recently reiterated, however:

> To obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's de-

---

5. No appeal has been taken by Benitez.

fense requires that the testimony offered on behalf of a codefendant be disbelieved. *United States v. Potamitis*, 739 F.2d at 790; *United States v. Carpentier*, 689 F.2d 21, 27–28 (2d Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983).

*United States v. Tutino*, 883 F.2d 1125, 1130 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

Matos does not begin to satisfy this rigorous standard. The trial posture of his codefendants was essentially directed to asserting their lack of involvement in the cocaine transaction. Especially in view of the redaction of their postarrest statements before they were admitted in evidence, this line of defense did not even entail, much less necessarily require, an assertion of Matos' guilt. Accordingly, severance was properly denied to Matos.

B. *The Statements of Benitez and Ramirez.*

Matos contends that the admission in evidence of Benitez' redacted postarrest statement, *see supra* note 2, and of testimony by DEA agent Petrino concerning Ramirez' postarrest statement which transmitted the substance of that statement while substituting references to an anonymous "friend" of Ramirez for the original statement's references to Matos, *see supra* note 3 and accompanying text, deprived Matos of a fair trial in a number of ways.

1. The Redacted Benitez Statement.

■ Matos advances two contentions regarding the redacted Benitez statement. First, he urges that because both the government and counsel for Benitez indicated to the jury in their opening remarks that Benitez had made a statement to police—and that this statement was important—Matos was severely prejudiced when, during trial, (a) the DEA agent who interviewed Benitez after his arrest identified the redacted statement as a "partial transcript of the statement that Mr. Benitez gave me on that night," and (b) Benitez' counsel stated in his summation that the

statement used at trial was a "partial" one. In Matos' view, once the jury was advised that Benitez' statement was significant, any indication of the partial nature of a transcript would necessarily yield the inference that the omitted portion contained "the truth as to who was responsible[,] i.e. MATOS."

■ Obviously, this claim is pure speculation, and improbable speculation at that. Furthermore, any "error" which might be postulated was clearly remediable through curative instructions. *See United States v. Nixon*, 779 F.2d 126, 133 (2d Cir.1985). The district court appropriately gave Matos' counsel the opportunity to offer such instructions, which was declined. We see no basis for reversal.

■ Matos's second contention regarding the Benitez statement is that the redacted version left out information crucial to Matos' defense. Specifically, Matos claims prejudice because in Benitez' original unredacted statement Benitez said that Matos and Ramirez entered Apartment 4J together. This contrasts with DEA agent Kerrigan's testimony and Ramirez' statement, both of which related that Matos went to the apartment first, with Ramirez arriving later. The ultimate effect, Matos claims, is that admitting the portion of the Benitez statement referring to when Matos and Ramirez entered Apartment 4J would have "shaken" the testimony of Agent Kerrigan, with the result that "the case aginst [sic] MATOS would have fallen because then there would be no theory against him." We disagree.

■ First, we find no indication in the record, nor does Matos assert, that Matos advanced this contention at any point during the proceedings below. He obviously had more than ample opportunity to do so. Before admitting the redacted statements, the district court conferred with counsel, extensively and on the record, in order to generate mutually agreeable versions of the statements. Second, although a "rule of completeness" governs the redaction of statements, that rule is violated "only where admission of the statement in re-

dacted form distorts its meaning or excludes information substantially exculpatory of the declarant." *United States v. Alvarado*, 882 F.2d 645, 651 (2d Cir.1989) (citing *United States v. Kaminski*, 692 F.2d 505, 522 (8th Cir.1982)), *cert. denied,* —— U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). We think it clear that neither of these defects is present here, and we accordingly perceive no reversible error.

2. DEA Agent Petrino's Testimony concerning the Ramirez Statement.

Matos advances two contentions as to the Ramirez statement. Tangentially, he argues that because counsel for Ramirez focused in his opening remarks (as had counsel for Benitez) on the statement of his client, the trial testimony of two agents that Matos had refused to answer questions at the time of his arrest "gave the jury the impression that MATOS was doing something wrong by not answering the Agent's questions when he had a Constitutional right to remain silent." As a result of that testimony, Matos moved for a mistrial. The district court denied the motion, but agreed to give a curative instruction to the jury. Matos gives us no reason to deem inadequate the instruction that the district court ultimately gave to the jury, and his claim accordingly fails. *See Nixon,* 779 F.2d at 133.

■ Matos' primary contention regarding the Ramirez statement is that the admission of testimony concerning that statement, wherein an anonymous reference to a "friend" of Ramirez was substituted for Matos' name, violated Matos' rights under the confrontation clause of the sixth amendment as defined in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We disagree.

In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Supreme Court held that "the Confrontation Clause is not violated by the admission of a nontestifying co-defendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481

U.S. at 211, 107 S.Ct. at 1709. While the Court expressly reserved the question of the "admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun," *id.* at 211 n. 5, 107 S.Ct. at 1709 n. 5, we considered that very question recently—after Matos' conviction—in *United States v. Tutino,* 883 F.2d 1125 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). We there held that "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's *Bruton* rights." 883 F.2d at 1135; *see also Alvarado,* 882 F.2d at 651–53.

■ The word "friend" in the redacted Ramirez statement is a "symbol" that serves the office of a "neutral pronoun," and thus brings this case within the rule in *Tutino.* Matos points out, however, that this rule has been violated because counsel for Ramirez read the unredacted version of the Ramirez statement to the jury in his opening remarks. As a result, Matos contends, there has been an impermissible "indication to the jury that the original statement contained [an] actual name[ ]," *see Tutino,* 883 F.2d at 1135, thus requiring us to reverse his conviction. Reversal is not warranted, however, on this record.

The redaction of the Benitez and Ramirez statements was a matter of central concern in this joint trial. Yet, when Ramirez' counsel, in his opening remarks, read his client's unredacted statement, Matos' counsel made no objection. Moreover, Matos' counsel did not even mention the Ramirez opening statement when the district court subsequently conducted a detailed discussion regarding the redaction of the Ramirez statement. The transcript of that discussion indicates that counsel attached no significance to the earlier reading of the Ramirez statement. Rather, the absence of any mention of the issue at this, or any other, point in the proceedings sug-

gests " 'counsel's own difficulty in finding any prejudice.' " *Friedman*, 854 F.2d at 581 (quoting *United States v. Canniff*, 521 F.2d 565, 572 (2d Cir.1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976)).

These observations are underscored by the fact that counsel's posttrial motion papers, while arguing that the "major legal issue presented to [the district court] during the course of this litigation was the Bruton question," again made no reference to the Ramirez opening statement. Instead, they focused exclusively upon the question whether the final form of the Ramirez redaction was appropriate. Only after *Tutino* answered the latter question in the government's favor, it would appear, did the issue now presented capture counsel's attention.

In short, we are now being asked to revisit a matter that was hotly contested and thoroughly debated by the parties, and to enter a reversal based upon an argument that was never raised below, even though it could have been fully addressed well before any substantial amount of judicial and prosecutorial resources had been expended in connection with this case. In such circumstances, we do not hesitate to reject the claim. *See United States v. Briggs*, 457 F.2d 908, 911 (2d Cir.) ("the general rule is that 'the burden is on the defendant to take his objection at the earliest possible opportunity when, by so doing he can enable the trial judge to take the most efficacious action' ") (quoting *Holden v. United States*, 388 F.2d 240, 242–43 (1st Cir.), *cert. denied*, 393 U.S. 864, 89 S.Ct. 146, 21 L.Ed.2d 132 (1968)), *cert. denied*, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972).

■ Nor is the present case one of the rare instances meriting application of the doctrine of plain error. *See* Fed.R.Crim.P. 52(b). "Only if serious injustice was inflicted upon a defendant, or if he was convicted in a manner inconsistent with fairness and integrity of judicial proceedings, will we exercise our power under the plain error rule." *United States v. Bryant*, 480 F.2d 785, 790 n. 3 (2d Cir.1973) (citing *United*

*States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)); *see also United States v. Whaley*, 830 F.2d 1469, 1476 (7th Cir.1987) ("plain error is an error resulting in 'an actual miscarriage of justice, which implies the conviction of one who but for the error would have been acquitted.' ") (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985)), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *Briggs*, 457 F.2d at 912; *United States v. Indiviglio*, 352 F.2d 276, 280–81 (2d Cir.1965), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); 3A C. Wright, Federal Practice and Procedure § 856 (2d ed. 1982 & Supp.1990). No such injustice or basic unfairness is presented here.

### C. *Sufficiency of the Evidence.*

■ Matos contends, finally, that the district court erred in denying his posttrial motion for acquittal under Fed.R.Crim.P. 29(c) as to the cocaine counts. He argues that the evidence against him showed no more than was shown by the evidence against Ramirez, whom the jury acquitted. The evidence against both, Matos claims, showed mere "presence and flight." Thus, he contends, the evidence at trial was legally insufficient to support his convictions for conspiring to distribute, and distributing, cocaine. Again, we disagree.

A defendant "bears a 'very heavy burden' in challenging the sufficiency of the evidence" against him. *Chang An–Lo*, 851 F.2d at 553 (quoting *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986)); *see also Torres*, 901 F.2d at 216; *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir.1989). In our review of such claims, " 'pieces of evidence must be viewed not in isolation but in conjunction.' " *United States v. Brown*, 776 F.2d 397, 403 (2d Cir.1985) (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). Furthermore, "we must credit every infer-

ence that could have been drawn in the government's favor." *Villegas*, 899 F.2d at 1339 (citing *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983)). "If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be sustained." *Chang An-Lo*, 851 F.2d at 554. Further, the government need not "preclude every reasonable hypothesis which is consistent with innocence." *Id.* (citing *United States v. Fiore*, 821 F.2d 127, 128 (2d Cir.1987)).

Conceding these general propositions, Matos responds that "presence ..., even coupled with ... knowledge ... [of] the sale of narcotics, is not sufficient to establish ... knowing membership in [an] alleged conspiracy." *United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir.1984) (citing *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983)); *see also United States v. Johnson*, 513 F.2d 819, 823–24 (2d Cir. 1975). Rather, "proof of a specific intention ... to violate the substantive statute—that is, to possess cocaine with intent to distribute it—is essential to sustain the conspiracy conviction." *Gaviria*, 740 F.2d at 184 (citing *Soto*, 716 F.2d at 993). Matos contends that only his "presence and flight" have been established, precluding his conviction on the cocaine counts.

As the Fifth Circuit recently stated, however:

"In most cases including this one ... the evidence establishes not mere presence but presence under a particular set of circumstances. In such a case, the task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the 'mere presence' rubric. Rather, it requires an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation."

*United States v. Henry*, 849 F.2d 1534, 1537 (5th Cir.1988) (quoting *United States v. Cruz–Valdez*, 773 F.2d 1541, 1545 (11th Cir.1985) (in banc), *cert. denied*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986)).

Here, the government introduced more than ample evidence from which a reasonable jury could find knowing membership in the conspiracy, and purposeful behavior to further it. In denying Matos' posttrial motion, the district court stated:

Matos went in and out of 2230 University Avenue at virtually the same time as the co-conspirators Jimenez, Benitez, and Torrez. He left 2230, as they did, to enter 2845 University Avenue, where he went to Apartment 4–J, at 10:00 p.m.—precisely the time when Jimenez's wife told Slovenkay that the "unforeseen problem" had been resolved so that the deal could go ahead as planned—which it did. Thus, Matos's actions do not fit within the narrow bounds of cases finding mere presence.

Even without the unredacted post-arrest statement by Benitez, that "[t]he black guy showed up with another small Spanish male who also jumped out the window. The black guy took a package out of a black nylon bag and handed it to Jimmie," it was reasonable for the jury to draw an inference that Matos was the source of the kilogram of cocaine which Jimenez delivered to Slovenkay. That inference was strengthened by Matos's four-story leap to the ground admittedly in order to avoid the police, by his attempt to hide, and by his possession of heroin.

Little need be added to this analysis. Clearly, a jury could reasonably find, based upon the evidence summarized by the district court, that Matos' behavior exhibited knowing participation in the conspiracy, and be bolstered in its view by (1) the listings for "Alfredo" and "Fredo" in address books found in Apartment 4J, and (2) the index card headed "Alfred" with a running tally of dollar amounts thereunder included in narcotics transaction records seized at Apartment 2A. Matos' contention that "it is equally possible and just as likely that [Matos] was [in the apartment]

to purchase rather than supply" relates at best to the weight of the evidence, and as such is "a matter for argument to the jury, not a ground for reversal on appeal." *Villegas*, 899 F.2d at 1339.

Conclusion

The judgment of conviction is affirmed.