**UNITED STATES of America**

v.

**Alfredo Peralta MATOS, Defendant.**

**No. SS 88 Cr. 153 (RWS).**

United States District Court,
S.D. New York.

Dec. 30, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y.
(Peter B. Sobol, Asst. U.S. Atty., of counsel), New York City, for U.S.

Gerald J. DiChiara, New York City, for defendant.

OPINION

SWEET, District Judge.

Defendant Alfredo Peralta–Matos ("Matos") has moved pursuant to Rule 33, Fed. R.Crim.P. for an order granting him a new trial. For the following reasons, the motion is denied.

*Procedural and Factual Background*

Matos was convicted on May 24, 1989 following a jury trial in which he was found guilty of (1) conspiring to distribute and to possess with intent to distribute over 500 grams of cocaine in violation of 21 U.S.C. § 846; (2) distributing and possessing with intent to distribute, together with codefendants, approximately 1,007 grams of cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2; and (3) possessing with intent to distribute approximately 0.844 grams of heroin in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C) and 18 U.S.C. § 2.

The conviction arose from a narcotics transaction between Matos and his codefendants and agents of the Drug Enforcement Administration ("DEA"). On December 5, 1990, Matos's conviction was affirmed by the Second Circuit. *See United States v. Benitez*, 920 F.2d 1080 (2d Cir. 1990). The evidence at trial, as discussed by the Second Circuit on appeal, established the facts as follows.

In December 1987, undercover DEA agent Thomas C. Slovenkay ("Slovenkay") had several telephone conversations with a Eugene Jimenez ("Jimenez") that culminated in a transaction at 161st Street and the Grand Concourse in the Bronx, New York, on December 29, 1987 in which Slovenkay purchased from Jimenez approximately 52.6 grams of 63% pure cocaine for $2,500 in pre-recorded currency. Following the sale, Jimenez, followed by undercover DEA agent James Kerrigan ("Kerrigan"), went to an apartment building at 2230 University Avenue in the Bronx. At a later date, Slovenkay received a telephone message from Jimenez requesting that Slovenkay call him at a number listed to one Harry Torres ("Torres") at Apartment 2A ("Apartment 2A") at 2230 University Avenue.

On January 13, 1988, Slovenkay called the number and spoke to both Jimenez and Torres, who agreed to sell Slovenkay a kilogram of cocaine in exchange for $23,-500, with the transaction to be carried out in four equal installments. The next day, Slovenkay and Jimenez talked on the telephone and agreed to consummate the sale that evening.

According to DEA agent J. Michael Smith ("Smith"), at approximately 8:00 p.m. in the evening of January 14, 1988, a Spanish male, whom he later identified as Matos, drove up to the entrance of 2230 University Avenue, parked, and entered the building. Jimenez arrived and entered the building at approximately 8:25 p.m. Matos departed at approximately 8:35 p.m. Shortly thereafter, Jimenez, Torres, and William Gonzalez–Benitez ("Benitez") departed 2230 University Avenue, and took a taxi cab to and entered an apartment building at 2845 University Avenue.

Later that evening, Jimenez and Slovenkay met at 161st Street and the Grand Concourse where, pursuant to their prior agreement, Slovenkay gave Jimenez the first installment of $5,900 in pre-recorded currency. Jimenez thereupon returned to 2845 University Avenue to pick up the cocaine. At approximately 10:00 p.m., Matos was observed by surveillance officers exiting a car and entering 2845 University Avenue.

Meanwhile, Slovenkay waited for Jimenez to return with the cocaine. Shortly after 10:00 p.m., Slovenkay spoke on the telephone with Jimenez's wife, who informed him that "some unforeseen problem had developed from the people involved in this thing," and that Slovenkay would "have to sit and wait." Approximately five minutes later, she advised Slovenkay that Jimenez "said he'll be there in ten minutes." About ten minutes later, Jimenez did arrive, bearing a kilogram of cocaine wrapped in a brown paper bag, a plastic container, and plastic wrapping. Affixed to the paper bag was a Sears and Roebuck label addressed to "William Beniter [sic],

2845 University Avenue, Apartment 4J, Bronx, New York."

Jiminez gave the cocaine to Slovenkay, and was thereupon arrested by DEA agents. Agents then went to Apartment 4J at 2845 University Avenue ("Apartment 4J") and entered by breaking down the steel door to the apartment with a sledgehammer. The agents found Torres and Benitez inside, and arrested them. Matos and Hector B. Ramirez ("Ramirez"), who had also been inside, had jumped through the back window of the apartment. Ramirez lay on the ground below; Matos was found at the end of a trail of blood leading to the building's basement utility room. The agents arresting Matos found, on the ground in the utility room where Matos was standing at the time of his arrest, a package containing a sample of 0.333 grams of 86% pure heroin and glassine envelopes containing 17% pure heroin. Matos later admitted to the physician treating his wounds at Montefiore Hospital that he had jumped out of a window upon the arrival of the police.

Subsequently, pursuant to search warrants, the DEA agents recovered from Apartment 4J: cocaine, heroin, marijuana, various narcotics paraphernalia, cutting agents, weapons, ammunition, holsters, drug records, address books, and a flight jacket that Matos was wearing when he was observed entering the building. The address books listed telephone numbers for "Alfredo" and "Fredo" and a ledger card bore the heading "Alfred." From Apartment 2A, the agents seized: heroin, cocaine, narcotics paraphernalia, cutting agents, an address book, narcotics transaction records, and $10,425 in United States currency that included prerecorded currency from the December 29, 1987 and January 14, 1988 transactions between Jimenez and Slovenkay. The narcotics transaction records included an index card headed "Alfred" bearing a running tally of dollar amounts.

After being advised of and waiving his constitutional rights, Benitez gave a signed postarrest statement in which he acknowledged that at 9:00 p.m. on January 14, 1988, while with Jimenez in Apartment 2A, he had agreed that his apartment, Apartment 4J, could be used to "make some money fast," and that he and Jimenez had then traveled by cab from 2230 University Avenue to 2845 University Avenue. Benitez further stated that a "black guy" with a beard had been at Apartment 2A, had departed to "go get that" saying "he would see us later," and had reappeared at Apartment 4J with a "small Spanish male" with a package, "the evidence we have now." Benitez added that when the DEA agents announced their presence at Apartment 4J, "the black guy and the Spanish guy went to the bedroom and I heard breaking glass." Benitez's statement was admitted in evidence at trial, but was redacted to delete any reference to the "black guy," the "small Spanish male," and the "Spanish guy."

After warrants were issued for his arrest, Matos surrendered to the authorities on April 15, 1988.

On May 16, 1988, an eleven-count superseding indictment (the "Indictment") was filed against Matos, Ramirez, Torres, Benitez and Jimenez. Matos was charged only in Counts One, Three, and Eleven.

On or about May 24, 1988, DEA agents arrested Ramirez on charges underlying the Indictment. After being advised of and waiving his constitutional rights, Ramirez gave an oral statement in Spanish, which was translated and transcribed by DEA Special Agent Anthony Petrino ("Petrino"). Ramirez stated that on January 14, 1988, he had driven Matos to 2845 University Avenue and waited in the car while Matos went inside. After approximately one hour, Ramirez became concerned for Matos's safety, entered the building and was directed to Apartment 4J by a teenager who "asked him if Ramirez was looking for Matos." When he went into the apartment, Ramirez saw two unknown persons and Matos, together with a machine gun on a table that Ramirez thought was a toy. Shortly thereafter, there was a knock on the door; looking through a peep-hole, Ramirez saw an Indian boy who said, "they are not going to kill you." Ramirez, not

knowing the police were at the door, jumped through the glass and out the bedroom window.

At trial, Ramirez's transcribed statement was not admitted into evidence. Rather, DEA agent Anthony Petrino, who had translated into English Ramirez's Spanish statement, testified as to the interview with Ramirez, modifying it only to the extent that all references to Matos by name were replaced by a reference to a "friend."

Jimenez and Torres entered guilty pleas to Count Three of the Indictment prior to trial. Each was sentenced to five years' incarceration followed by four years of supervised release. Jimenez and Torres refused to testify with respect to Matos at trial, each expressing fear of physical retribution by Matos against them and their families. *See* Kerrigan Aff. ¶ 4(h); Sobol Aff. ¶¶ 19–21. Jimenez had given a signed statement in which he swore that it was the "Gods honest truth" that it was his "personal feeling [ ] that Alfredo [Matos] got the coke pass it to Willie [Benitez] who passed it to Harry [Torres] and then to my hands." *See* Kerrigan Aff. ¶ 3.

Prior to trial, this court denied the motion of Matos and his co-defendants Torres and Benitez to suppress physical evidence seized and the post-arrest statements by Benitez and Torres. *United States v. Matos–Peralta,* 691 F.Supp. 780, 787–88 (S.D.N.Y.1988).[1] At the same time, these defendants also moved for severance pursuant to Rule 14, Fed.R.Crim.P., contending that the admission of postarrest statements by codefendants Benitez and Jimenez would have an unduly prejudicial effect upon their defenses. *Id.* at 790. The court denied the severance motion but in view of the protections recognized in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), directed that Jimenez's statement be redacted prior to its introduction at trial to exclude those portions independently implicating Matos, Benitez and Torres. *Id.* Upon renewal of Matos's objection at trial to his co-defen-

dant's statements, the court admitted the statements of Benitez and Ramirez in redacted form and gave a limiting instruction after the admission of Benitez's statement and in the charge to the jury.

After the joint trial of Matos, Ramirez and Benitez in September of 1988, the jury found Matos and Benitez guilty on all counts in which they were named and acquitted Ramirez on all counts. After trial, Benitez and Matos moved for judgments of acquittal n.o.v. or, in the alternative, for new trials pursuant to Rule 33, Fed. R.Crim.P.

Matos contended that Petrino's testimony regarding Ramirez's post-arrest statement was improperly admitted at trial and that the evidence at trial was insufficient to support his conviction. In an unpublished opinion dated April 7, 1989, this court denied Matos's post-trial motions finding that there was sufficient evidence from which to draw a proper inference of his guilt. Namely, the court cited the fact (1) that Matos entered and exited 2230 University Avenue at virtually the same times as Jimenez, Benitez and Torres and (2) that he left 2230, as they did, and entered 2845 University Avenue, where he went to Apartment 4J at approximately 10:00 p.m., precisely when Jimenez's wife told Slovenkay that the "unforeseen problem" had been resolved. Moreover, the court found that:

> Even without the unredacted post-arrest statement by Benitez, that "[t]he black guy showed up with another small Spanish male who also jumped out the window. The black guy took a package out of a black nylon bag and handed it to Jimmie," it was reasonable for the jury to draw an inference that Matos was the source of the kilogram of cocaine which Jimenez delivered to Slovenkay. That inference was strengthened by Matos's four-story leap to the ground admittedly in order to avoid the police, by his attempt to hide, and by his possession of heroin.

---

1. The motion to suppress any post-arrest statements by Torres was denied as premature absent production of any evidence of such state-

ments by Torres. *Matos–Peralta,* 691 F.Supp. at 788.

Matos was subsequently sentenced to seventy-two months' imprisonment, to be followed by a four-year term of supervised release. The Court of Appeals for the Second Circuit affirmed Matos's conviction over challenge to this court's denial of the severance motion, admission of the redacted statements of Benitez and Ramirez and finding that the evidence was sufficient to support the conviction. The Second Circuit found that "the government introduced more than ample evidence from which a reasonable jury could find knowing membership in the conspiracy, and purposeful behavior to further it," and that "[l]ittle need be added to [the district court's] analysis." *Benitez*, 920 F.2d at 1089. Based on the evidence summarized by this court and, additionally, (1) the listings for "Alfredo" and "Fredo" in address books found in Apartment 4J and (2) the index card headed "Alfred" with a running tally of dollar amounts included in narcotics transactions records seized at Apartment 2A, the Second Circuit agreed that the evidence was sufficient.

Matos is presently at liberty on $100,000 bond. Subsequent to his conviction, Benitez was killed in an unrelated incident during the night of November 22–23, 1989.

On January 15, 1991, Matos filed the present motion to vacate his conviction and order a new trial based upon "newly discovered evidence" in the form of affidavits from Jimenez and Torres, both sworn to December 22, 1990, which in substance claim that Matos did not deliver the cocaine to 2845 University Avenue. Due to a long series of adjournments at the request of the parties, the motion was not heard and considered fully submitted until October 30, 1991.

*Discussion*

The "newly discovered evidence" on which Matos bases his motion consists of two purportedly exculpating affidavits given and sworn to on December 22, 1990 by Jimenez and Torres, both of whom refused to testify at trial.

Jimenez's affidavit states in relevant part that:

5. However, since Alfredo Matos is not guilty of this crime I must let the Court know that I would now be willing to give evidence on his behalf.

6. The night that I was arrested Willie Benitez told me to say that the drugs were Alfredo's. This was not true to the best of my knowledge.

7. I have no idea how the drugs got to Willie's apartment but they were in the apartment when we arrived there.

8. Alfredo Matos never came to 2230 University Avenue that evening. The only three people there were Willie Benitez, Harry Torres and myself.

9. We went from that apartment to Willie's apartment at 2845 University Avenue to get the drugs.

10. A minute before I left to deliver the drugs the intercom buzzed. I heard Willie answer and Willie buzzed to let him (Alfredo) into the building.

11. As I was leaving I passed Alfredo and another guy in the hallway. I never met him before or after that date.

13. To the best of my knowledge Alfredo Matos was not involved in this transaction at all.

*See* Matos Ex. A.

Torres's affidavit includes the following statements:

4. I am making this affidavit because it would be wrong for Alfredo Matos to go to jail for something he wasn't involved in.

6. However, rather than let an innocent man go to jail I am now willing to testify that Alfredo Matos was not involved in the cocaine deal that Jimenez, Benitez and I were involved with.

7. Matos never came to the apartment located at 2230 University Avenue nor did he ever bring any cocaine to 2845 University Avenue the evening that I was arrested.

8. The reason Jiminez, Benitez and I went to 2845 University Avenue was to get the cocaine for the deal.

9. That's where it was stored.

10. Matos's arrival that night had nothing to do with this deal and was an unfortunate coincidence for him.

*See* Matos Ex. B.

██ Motions for a new trial based on newly discovered evidence are not favored and should be granted only with "great caution," *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987); *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976), and only in "*'the most extraordinary circumstances.'*" *United States v. Ochs,* 548 F.Supp. 502, 512 (S.D.N.Y.1982) (quoting *United States v. Fassoulis,* 203 F.Supp. 114, 117 (S.D.N.Y.1962)), *aff'd,* 742 F.2d 1444 (2d Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). To obtain a new trial based on newly discovered evidence, the defendant must show (1) that the evidence is truly newly discovered, i.e., discovered after trial; (2) that it could not, with due diligence, have been discovered prior to or during trial; (3) that the evidence is material and not cumulative or impeaching; and (4) that the evidence would probably lead to acquittal. *United States v. Underwood,* 932 F.2d 1049, 1052 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *United States v. Diaz,* 922 F.2d 998, 1006–07 (2d Cir.1990) ("new" evidence must create "a reasonable doubt that did not otherwise exist"), *cert. denied,* — U.S. —, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991); *United States v. Tutino,* 883 F.2d 1125, 1140 (2d Cir.1989), *cert. denied,* 493 U.S. 1081 & 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *DiPaolo,* 835 F.2d at 49; *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir. 1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980); *United States v. Castano,* 756 F.Supp. 820, 823 (S.D.N.Y.1991).

The potential testimony of Jimenez and Torres is material, and, to the extent that it would be offered for reasons other than to impeach the already hotly-contested statement of Benitez, it is not cumulative or impeaching. Nevertheless, this evidence fails to satisfy the remaining criteria listed above.

First, the potential testimony is not "newly discovered." A number of courts have held that the testimony of a co-defendant who chose not to testify at the trial or who previously asserted his right against self-incrimination is not newly discovered evidence. *United States v. Persinger,* 587 F.Supp. 899, 901 (W.D.Pa.1984); *see, e.g., United States v. Jacobs,* 475 F.2d 270, 286 (2d Cir.), *cert. denied sub nom., Lavelle v. United States,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973); *Castano,* 756 F.Supp. at 823 (citing cases).

██ At the time of trial, Matos knew that Jimenez and Torres were alleged co-conspirators. Thus, assuming that the substance of their potential testimony is true, Matos surely knew that they "possessed relevant information which could exonerate him because he must have known" that they could testify that he did not deliver the cocaine taken by Jimenez to the DEA agent and that he was not at the two apartments at the relevant times, and that Torres "could have testified that [Matos] was merely present at the scene of the crime and was not a member of the conspiracy." *See Castano,* 756 F.Supp. at 823. Given the circumstances, the testimony of Jimenez and Torres "can at best be characterized as 'newly available,' which is not 'synonymous with newly discovered evidence on a Rule 33 motion.'" *Id.* at 823–24 (quoting *United States v. DiBernardo,* 880 F.2d 1216, 1225 (11th Cir.1989)).

Concededly, both Jimenez and Torres refused to consent to interviews by any codefendants, and hence Matos did not know exactly what they would say on the stand. Nevertheless, as the Court of Appeals for the Fifth Circuit has written:

The precise testimony of any potential witness cannot be known until it is had.... The decision not to interview [the witnesses], and not to call either witness, whether wise or not, was a deliberate and strategic one. The defendant is not entitled to a new trial so that he may employ a different strategy. Because the proffered testimony was readi-

ly available at the time of trial, there is no newly discovered evidence within the meaning of Rule 33.

*United States v. Beasley*, 582 F.2d 337, 339 (5th Cir.1978); *see also United States ex rel. Regina v. LaVallee*, 504 F.2d 580, 583 (2d Cir.1974) (defendant may not obtain new trial on basis of "new evidence" in form of testimony of witness available but not called at trial), *cert. denied*, 420 U.S. 947, 95 S.Ct. 1330, 43 L.Ed.2d 425 (1975). For these reasons, Jimenez's present statement cannot be considered newly discovered evidence simply because Matos chose not to call Jimenez because "Jiminez [sic] had indicated through his post-arrest statement that if called to testify he would inculpate, albeit falsely, rather than exculpate Matos," Matos Memo. at 9, 12.

■ Moreover, Matos has failed to establish that he could not with due diligence have discovered this evidence prior to trial. Despite the claim of Matos's trial counsel that "[i]n the past they [Jimenez and Torres] had been unwilling to speak to or assist me," DiChiara Aff. ¶ 22, and that "[a]t that time these attempts were unsuccessful and it was clear that both defendants would invoke their 5th Amendment privilege if called to testify," he has produced no evidence of any attempts to subpoena either co-defendant before or during trial, *see United States v. Cruz*, 602 F.Supp. 825, 833 (S.D.N.Y.1985), or to request that the Government grant them immunity. *Castano*, 756 F.Supp. at 824 (citing *Cruz*, 602 F.Supp. at 830); *United States v. La Duca*, 447 F.Supp. 779, 786–88 (D.N.J.), *aff'd*, 587 F.2d 144 (3d Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

■ Finally, contrary to his claim that the testimony "would directly challenge the hypothesis of guilt that the Prosecution proffered and the jury accepted to convict Matos," Matos Memo. at 11, Matos has not shown that the purportedly "newly discovered" evidence would "probably lead to acquittal."

The potential testimony of Jimenez and Torres does not compromise the evidence adduced at trial: that DEA agents ob-served Matos entering and departing 2230 University Avenue at approximately the same times as his co-defendants were going in and out; that DEA agents observed him entering 2845 University Avenue at approximately the time Jimenez's wife informed Slovenkay that the "unforeseen problem" had been resolved; that Matos was present in Apartment 4J when police arrived, admittedly jumped out of the fourth-story window to escape and was found in possession of heroin; that address books found in Apartment 4J contained listings for "Alfredo" and "Fredo"; and that the narcotics transaction records seized from Apartment 2A included an index card bearing the heading "Alfred" and a running tally of dollar amounts. This evidence was found, not only by this court but also by the Second Circuit, to be sufficient to support Matos's conviction.

Matos maintains, nevertheless, that the potential testimony directly undermines the jury's crucial inference from the tandem of movement between 2230 University Avenue and 2845 University Avenue by Matos and the other co-conspirators that Matos played a role in the conspiracy. However, even assuming that such an inference was the basis for the jury's verdict, Matos still has not shown that the potential testimony would "probably" lead to acquittal. The credibility of Jimenez and Torres, both of whom have been convicted and are serving sentences for their involvement in this transaction, is questionable. *See United States v. MacDonald*, 640 F.Supp. 286, 324 (E.D.N.C.1985) ("It is within the province of the court when ruling on a motion for new trial based upon newly discovered evidence to examine the credibility of those individuals who give statements in support of the motion." (citing *United States v. Johnson*, 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946)). As sentenced co-defendants, neither has anything to lose by exonerating Matos and their testimony is therefore "inherently suspect." *Castano*, 756 F.Supp. at 824 (quoting *La Duca*, 447 F.Supp. at 782–83).

Furthermore, according to the affidavit of DEA agent Kerrigan, Jimenez was fear-

ful of testifying because of threats against him and his wife, which he believed were made by Matos. Kerrigan Aff. ¶¶ 4(h), 5. Likewise, Torres's trial counsel informed the Assistant United States Attorney that Torres would plead guilty "because he wanted to receive his sentence from the Court, not his co-defendant," or words to that effect. Sobol Aff. ¶ 19. If indeed Jimenez and Torres feared Matos, that would only give them reason to come forward on his behalf at trial, and calls into question their eleventh-hour exculpatory statements.

 Jimenez's credibility is made all the more dubious by (1) his inconsistent post-arrest statement, in which he stated as "the Gods honest truth" that his "personal feeling" was that Matos had supplied the cocaine for the transaction and (2) his statements to Kerrigan on June 21, 1988, just before he pleaded guilty, to the effect that he had met Matos on several other occasions at Torres's house, that Torres had called "Alfredo" in his presence on January 13, 1988, and that "Alfredo brought the kilo over" to Apartment 4J in his "brown shoulder bag with a strap." Kerrigan Aff. ¶ 4. The direct contradiction between these statements and his present affidavit clearly demonstrates that he was either lying then or that he is lying now. Nevertheless, Matos has offered no reason for believing that the prior statements were false and that the present statement is true.[2]

Finally, it would not be "in the interest of justice," Fed.R.Crim.P. 33, to grant a new trial at this date. Deprived by the killing of Benitez of an important favorable potential witness, the "in the interest of justice" qualification of Rule 33 would be undermined by burdening the Government and the court with "the very burdens that the sixth amendment seeks to avoid being placed on defendants." *Cf. Garcia Montalvo v. United States,* 862 F.2d 425, 426 (2d Cir.1988) (per curiam).

*Conclusion*

For the foregoing reasons, Matos's motion for a new trial is denied.

It is so ordered.

---

2. The somewhat analogous recantations of a testifying witness are "'looked upon with the utmost suspicion.'" *DiPaolo,* 835 F.2d at 49 (quoting *United States ex re. Sostre v. Festa,* 513 F.2d 1313, 1318 (2d Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975)). To succeed on a motion for a new trial based on a witness recantation, the defendant must satisfy the court (1) that the testimony recanted was false and material; (2) that without the original testimony the jury probably would have acquitted the defendant; and (3) that the party seeking the new trial was surprised when the false testimony was given or did not know of its falsity until after the trial and could not with due diligence have discovered it earlier. *DiPaolo,* 835 F.2d at 49 (citing cases). Having failed to present evidence that the former statement was false, were Jimenez a recanting witness, Matos would not succeed on motion for a new trial based on his potential testimony.